60 P.3d 306

STATE of Hawai'i, Plaintiff–Appellee,

v.

Frank PAULINE, Jr., Defendant– Appellant.

No. 22961.

Supreme Court of Hawai'i.

Dec. 26, 2002.

Clifford B. Hunt, Honolulu, for defendant-appellant.

Charlene Y. Iboshi, First Deputy Prosecuting Attorney, and Lincoln S.T. Ashida, Deputy Prosecuting Attorney, for plaintiff-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, and RAMIL, JJ., and ACOBA, J., concurring separately.

Opinion of the Court by RAMIL, J.

The defendant-appellant Frank Pauline, Jr. appeals from the third circuit court's judgment of conviction[1] of murder in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 707–701.5 (1993), kidnapping, in violation of HRS § 707–720(1)(c)

(1993), and sexual assault in the first degree, in violation of HRS § 707–730(1)(a) (1993), and the subsequent sentence. On appeal, Pauline contends that the trial court erred in: (1) denying Pauline's motion to transfer the case to another circuit; (2) failing to review the videotape of Pauline's expert witness prior to ruling on its admissibility; (3) excluding the videotape of Pauline's expert witness as evidence; (4) allowing the jury's trunk hood "experiment" during the jury view and, thereby, violating Pauline's rights of due process, confrontation, and effective assistance of counsel; (5) excluding Pauline from the jury views of the car and, thereby, violating Pauline's right to be present at all stages of the proceeding; (6) failing to engage in an on-the-record colloquy with Pauline concerning included offense instructions; and (7) denying Pauline's motion for a new trial.

For the reasons set forth below, we hold that: (1) the trial court did not abuse its discretion in denying Pauline's motion to transfer; (2) the trial court did not abuse its discretion by failing to review the videotape of Pauline's expert witness prior to ruling on its admissibility; (3) the trial court did not err in excluding the videotape of Pauline's expert witness as evidence; (4) the jury's trunk hood "experiment" did not violate Pauline's rights to due process, confrontation, and effective assistance of counsel; (5) although the exclusion of Pauline from the jury views violated his right of presence, such error was harmless; (6) the failure of the trial court to engage in an on-the-record colloquy with Pauline concerning included offense instructions was not plain error affecting Pauline's substantial rights; and (7) the trial court did not abuse its discretion by denying Pauline's motion for a new trial. Accordingly, we affirm the trial court's judgment of conviction and sentence.

## I. BACKGROUND

### A. Factual Background

In December of 1991, Dana Ireland visited her sister in Puna on the island of Hawai'i.

1. The Honorable Riki May Amano presided over the trial and entered the judgment of conviction and sentence.

In the early afternoon of December 24, 1991, Ireland borrowed her sister's bicycle and rode over to her friend's house to invite him to a family Christmas dinner.

At about 4:45 p.m., in Waa Waa, Ida Smith, a local resident, heard crying near her house. When Smith investigated the noise, she found Ireland bloodied and her clothes torn off. Since Smith had no access to a phone, she had to hail cars from a nearby street to call for help.

At 5:36 p.m., Sergeant Robert F. Wagner of the Hawai'i County Police Department arrived at Kapoho Kai Drive and observed a black mountain bike on the right hand shoulder, with debris on the roadway. Wagner testified that he noticed "what appeared to be a gouge mark in the roadway area and what appeared to be acceleration marks on the roadway area leading up to where the bicycle was at." He also found a shoe, a clump of blond hair, and a wristwatch on the scene.

At 6:20 p.m., Officer Harold Pinnow of the Hawai'i County Police Department arrived at the Waa Waa scene. He observed several people attempting to comfort Ireland, who was "incoherent" and "seriously injured."

About half an hour later, Hawai'i County Fire Department paramedic, Johnson K. Kahili, arrived at the Waa Waa scene and observed that Ireland had numerous abrasions on her face, was suffering from shock, and "had a very large laceration ... to the right side of her head ... [through which her] skull was visible." Kahili further noted that he was unable to measure her blood pressure, which indicated that "her blood pressure was very low."

Later that night, the paramedics brought Ireland into the Hilo Medical Center emergency room, where she was treated by Dr. Nigel Palmer. Emergency room nurse, Reggie Agliam, observed that Ireland had "lost a lot of blood" and had sustained "a large laceration to her scalp" and "multiple contusions." Following emergency surgery, Ireland died. Dr. Charles Reinhold, pathologist at the medical center, performed an autopsy of Ireland and determined that she "died from massive blood loss due to multiple traumatic injuries throughout her body."

Dr. Kanthi Von Guenthner, forensic pathologist and first deputy medical examiner for the City and County of Honolulu, reviewed the medical records, including autopsy photographs, Dr. Reinhold's autopsy report, and X-ray reports. Dr. Von Guenthner observed that Ireland had numerous injuries, including damage to her brain and to the outer part of her head; extensive bleeding of her head; scrapes to her back, legs, and arms; bruising of her lips; tears with bleeding in her mouth; a bite mark to her left breast; fingernail scratch marks to her right breast; fingernail scratch marks on her left hip; extensive bruising to her neck, vagina, and scalp; and a broken pelvis and clavicle.

### B. *Pauline's Confession*

On June 18, 1994, Detective Steven Guillermo of the Hawai'i County Police Department met with Pauline at the Attorney General's Office on the island of O'ahu. After being advised of his constitutional rights, Pauline recounted what occurred on December 24, 1991. At trial, Guillermo testified as to Pauline's confession.

Pauline stated that Ian and Shawn Schweitzer stopped by his house during the early afternoon hours and asked him if he "wanted to go out and party." Pauline "understood that to mean if he wanted to go and join them to have some cocaine and probably go cruising." Pauline agreed and got into Ian's purple Volkswagen, with Ian driving and Shawn in the front passenger seat. They headed towards Pohoiki and made several stops to smoke cocaine.

As they neared Kapoho, they spotted Ireland standing on the roadside. Pauline explained, "At that time, Ian made some type of a comment to her, which is similar to the word ho or something like that." Ian immediately turned around and headed back in the direction towards Ireland. Pauline observed that the car was traveling at about 40 miles per hour when it struck Ireland. After driving over Ireland, Ian reversed over her again and then stopped the car. The Schweitzer brothers got out, picked Ireland up, and loaded her into the car's front trunk. They next

drove towards the Waa Waa area on Beach Road. They stopped once along the way to smoke crack and Ian also checked the car's trunk.

Pauline told Guillermo that when they reached the Waa Waa area, they stopped the car on a dirt roadway. Pauline then helped Ian remove Ireland from the trunk compartment. They placed her on the ground and Ian had sexual intercourse with her. Pauline later stated that he helped Ian in pulling Ireland's pants down. Ian then invited Pauline to also have sex with her, but Pauline refused. Ian told Pauline that they must kill her, or else she would be able to identify them. In response, Pauline walked back to the car and retrieved a tire iron from the back portion of the car. "At that point, he approached the victim, looked at her, and swung the tire iron at her head." Pauline acknowledged that "he did hit her but ... wasn't sure exactly where." Pauline later signed a formal statement, admitted in evidence, which stated that his intention in hitting Ireland with the tire iron was "to make sure [he] killed her." He also noted that Ian may have later struck Ireland. Pauline told Guillermo that when they left the scene, he did not realize that they had left Ireland behind until they arrived at the Schweitzer's home and were washing the car.

Guillermo testified that following the confession, the Hawai'i County Police escorted Pauline to the island of Hawai'i to conduct a "reconstruction" of Pauline's statements. At the Schweitzer residence, Pauline pointed out a Volkswagen that was now painted yellow and had no fenders, and identified this car as the vehicle involved in the incident. The car was later shown to the jury and the jury was instructed to treat the car like "any other evidence."

At trial, Pauline disavowed his confession and testified that he had lied to the police in order to get out of prison, where he faced death threats.

## C. Pretrial Proceedings

### 1. Indictment and Arraignment

On July 30, 1997, Pauline was indicted for murder in the second degree, kidnapping,

and sexual assault in the first degree. On July 31, 1997, Pauline was arraigned and entered pleas of not guilty.

### 2. Motion to Transfer Case

On January 21, 1999, Pauline filed a motion to transfer the case, "on grounds that there [was] so great a prejudice against the defendant in the Third Circuit that he cannot obtain a fair and impartial trial in the Third Circuit." On February 16, 1999, Pauline filed a memorandum in support of his motion to transfer the case, attaching over 875 pages of newspaper articles concerning either Pauline or the murder of Ireland. In denying the motion on February 18, 1999, the trial court explained that it was capable of ensuring a fair trial through precautionary actions, such as jury questionnaires, extensive voir dire, cautionary instructions, and appropriate jury instructions.

## D. Trial Proceedings

### 1. Reconstruction Videotape

At trial, Pauline sought to introduce not only the testimony of an accident reconstruction engineer, James Campbell, but also Campbell's report and videotape of a computer-generated simulation of the automobile incident. The videotape "show[ed] the accident event in real time" based upon the prosecution's theory, while the report summarized the results of the videotape:

The simulation clearly shows that the accident described by certain people could not likely have happen[ed]. The simulation['s] speeds were run at 20 MPH for the VW, and 5 MPH for Ms. Ireland. Simulation reveals her trajectory as she is struck by the VW. She is thrown into the air and comes back to earth and is again struck by the VW. This whole event lasts only 1.8 seconds in real time. Increasing the speed of the VW only causes more damage to Ms. Ireland. It is a reasonable engineering probability that Ms. Ireland was not struck by this VW vehicle. This simulated event obviously did not take place. It was only produced to show that this type of low sloping vehicle could not have caused Ms. Ireland's injuries. Her injuries were,

more likely than not, caused by a vehicle with a flatter upright radiator with a conventional hood on it. The VW sedan does not have a conventional radiator.

In response, the prosecution moved to strike Campbell's videotape, report, and testimony as it related to the computer simulation. The prosecution contended that the computerized reconstruction was unreliable given the numerous assumptions made. In opposition to the prosecution's motion, Pauline called Campbell, who testified, outside the presence of the jury, to his credentials and the validity of the reconstruction program. Campbell then explained that the data used by the computer program were derived from police reports, inspections of the bicycle and car, Pauline's statements to the police, and a reenactment of the accident.

The trial court agreed with the prosecution's argument and granted its motion to strike. As a result, the court prohibited Pauline from presenting Campbell's reconstruction videotape and report, as well as any testimony by Campbell regarding the videotape or his use of the computer reconstruction program.

### 2. *Jury Views and Trunk Hood "Experiment"*

On August 23, 1999, the jury was allowed to view the car and car parts, which had been identified by Pauline as being involved in the incident. Immediately before the view, the trial court explained to the jury that it would be viewing the car in the basement of the courthouse due to its large size. Nevertheless, the trial court instructed the jury to "consider the Volkswagen the same way that [it would] consider all of the other evidence in this case." The trial court further directed the jury to "not talk about or discuss anything while [it was] doing the viewing."

Prior to giving these jury instructions, the trial court had discussed the logistics of the viewing with counsel. The trial court decided, without objection from Pauline's counsel, that there would be no counsel present. The

trial court also determined that there would "be no speaking at all, not even with the Court and the Jurors at all." Thus, the viewing was not conducted on the record, and counsel and Pauline were not present.

The following morning, Pauline's counsel brought to the trial court's attention the fact that the front page of the *Hawai'i Tribune Herald* displayed a photograph of the car, which was taken immediately prior to the jury viewing.[2] The photograph depicted the car trunk compartment with the gas tank missing. Pauline complained that such "egregious tampering with the evidence [was] a direct attempt by the police and the prosecution to mislead the Jury by portraying this Volkswagen as having this big open front compartment." Pauline then orally moved that he be allowed, in the jury's presence, to take the testimony of the police and prosecution personnel in order to expose the prosecution's attempt to mislead the jury.[3] The trial court denied the motion, and instead decided that a re-viewing of the car, with the gas tank in the front trunk, would constitute appropriate "curative steps."

The trial court then instructed the jury with respect to the second viewing of the car. As with the first viewing, the second one was unrecorded and conducted without the presence of counsel or Pauline.

Following the second view, the trial court informed both parties of the jury's trunk hood "experiment":

> I want to inform Counsels [sic] that during the viewing the Jury asked the Law Clerks to have the trunk cover put back on the car. And the Law Clerk asked me whether we were going to allow that or not, and I did. So the-whoever the detectives are or people downstairs put the trunk lid back on the car. And although the Jurors didn't say anything, I guess some communicated by motion that they wanted to see the hood opened and closed. And so the detectives did that as well.

The affidavit of one of the law clerks states that the hood was opened and closed about

---

2. The newspaper photograph was received in evidence as Exhibit No. 1061.

3. Detective Steven Guillermo later explained that the gas tank was kept outside of the trunk compartment because that was how it was recovered.

two or three times. The trial court then asked whether there were any objections. Neither party objected.[4]

### 3. Prosecution's Withdrawal of Included Offenses Without On–The–Record Colloquy

After the jury was excused for the second viewing, the trial court judge began to settle the jury instructions, including those concerning murder in the second degree, kidnapping, and sexual assault in the first degree. The prosecution offered instructions relating to manslaughter and assault in the first degree, as included offenses of murder in the second degree. Pauline's counsel, however, argued against such instructions because they were inconsistent with Pauline's defense. Later, the prosecution informed the trial court that it was requesting that the included offense instructions be withdrawn, given that the included offenses were barred by the statute of limitations. Pauline's counsel did not object to the withdrawal, and after discussion with counsel regarding the statute of limitations, the trial court withdrew the included offense instructions.

### 4. Motion for a New Trial

On August 27, 1999, about fifteen minutes after the jury found Pauline guilty as charged, one of the alternate jurors, Marveen Teresa Miller, approached Pauline's investigator, Dan Boe. According to Boe's affidavit, Miller stated that she wanted to speak with Pauline's counsel, Clifford Hunt. Miller then made four statements to Hunt and Boe regarding the trial:

(1) "We believed no one would confess to a murder that they did not commit";

(2) "We believed [Ireland]'s body would fit in the Volkswagen's trunk";

(3) "We believed the Volkswagen was involved"; and

(4) "We believed Ken Baker."

On September 10, 1999, Pauline filed a motion for a new trial claiming, inter alia, that "certain irregularities may have occurred concerning the jury."

On October 20, 1999, Boe and William Perreira, the prosecution's investigator, held a telephone interview with Miller. The interview was summarized in separate memoranda written by Boe and Perreira, respectively. Miller clarified that when she had said "we," she actually meant "I."

At a hearing on October 25, 1999, Pauline argued that Miller's statements raised the issue of whether she discussed the evidence with the jurors prior to the commencement of formal deliberations, thereby violating Pauline's right to a fair trial by an impartial jury. Pauline further insisted that Miller's subsequent clarification only applied to one, rather than all, of the four statements made by her. Nonetheless, the trial court rejected Pauline's request to examine Miller by stating that the "loose reference" was insufficient to support further inquiry. After hearing argument on other issues, the trial court denied the motion for a new trial.

### II. Standards of Review

### A. Trial Court's Denial of Pauline's Motion to Transfer

A trial court's denial of a motion for change of venue due to pretrial publicity is reviewed for abuse of discretion. See State v. Hashimoto, 46 Haw. 183, 186, 377 P.2d 728, 732 (1962); see also State v. Okumura, 78 Hawai'i 383, 394, 894 P.2d 80, 91 (1995) (citing State v. Williamson, 72 Haw. 97, 102, 807 P.2d 593, 596 (1991) (citation and quotation marks omitted)); State v. Moyd, 1 Haw. App. 439, 441, 619 P.2d 1107, 1109 (1980).

### B. Reconstruction Videotape

"Whether expert testimony should be admitted at trial rests within the sound discretion of the trial court and will not be overturned unless there is a clear abuse of discretion." State v. Fukusaku, 85 Hawai'i 462, 472, 946 P.2d 32, 42 (1997) (quoting State v. Maelega, 80 Hawai'i 172, 180, 907 P.2d 758, 766 (1995)) (internal quotation marks omitted); see also State v. Torres, 60 Haw. 271,

---

4. After Pauline was found guilty, he raised the jury's conduct as grounds, inter alia, for a new trial. The trial court denied this motion.

277, 589 P.2d 83, 87 (1978); *State v. Smith,* 59 Haw. 565, 569, 583 P.2d 347, 350 (1978), *overruled on other grounds by State v. Kelekolio,* 74 Haw. 479, 849 P.2d 58 (1993). Generally, the trial court abuses its discretion when it "clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Klinge,* 92 Hawai'i 577, 584, 994 P.2d 509, 516 (2000) (quoting *State v. Ganal,* 81 Hawai'i 358, 373, 917 P.2d 370, 385 (1996) (citation omitted)).

### C. Trunk Hood "Experiment" During Jury View

■ With regard to the issue of whether outside influence rises to the level of substantial prejudice, the reviewing court, "giving due deference to the trial court's discretion, is to make an independent examination of the totality of the circumstances to determine if there are any indications that the defendant's trial was not fundamentally fair." *Okumura,* 78 Hawai'i at 394, 894 P.2d at 91 (citing *State v. Keliiholokai,* 58 Haw. 356, 360, 569 P.2d 891, 895 (1977)) (internal citation marks omitted); *see also State v. Samonte,* 83 Hawai'i 507, 527, 928 P.2d 1, 21 (1996).

### D. Pauline's Right to Be Present at Jury Views of the Car

■ We review questions of constitutional law *de novo* under the "right/wrong" standard. Accordingly, this court "exercis[es][its] own independent judgment[,] based on the facts of the case." *State v. Jenkins,* 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citations omitted).

### E. Prosecution's Withdrawal of Included Offense Instructions Without On–The–Record Colloquy

■ The issue of whether the trial court was required to engage in an on-the-record colloquy with Pauline presents a question of law. We review questions of law *de novo* under the right/wrong standard of review. *See State v. Friedman,* 93 Hawai'i 63, 68, 996 P.2d 268, 273 (2000) (citing *Francis v. Lee Enterprises, Inc.,* 89 Hawai'i 234, 236, 971 P.2d 707, 709 (1999) (citations omitted)).

### F. Trial Court's Denial of Pauline's Motion for a New Trial

■ "As a general matter, the granting or denial of a motion for new trial is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion." *Samonte,* 83 Hawai'i at 527, 928 P.2d at 21 (quoting *State v. Furutani,* 76 Hawai'i 172, 178–79, 873 P.2d 51, 57–58 (1994) (citations omitted)). More specifically, we observed that "[t]he same principle is applied on [sic] the context of a motion for new trial premised on an impartial jury." *Id.* (citing *Furutani,* 76 Hawai'i at 179, 873 P.2d at 58).

### III. Discussion

### A. Trial Court's Denial of Pauline's Motion to Transfer

Pauline contends that the trial court abused its discretion by denying his motion to transfer the case to another circuit. Hawai'i Rules of Penal Procedure (HRPP) Rule 21(a) provides for a change of venue in certain cases:

> The court upon motion of the defendant shall transfer the proceeding as to him to another circuit ... if the court is satisfied that there exists in the circuit where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in the circuit.

Pauline claims that, in this case, the court should have presumed there was "so great a prejudice" to his right to a fair and impartial trial under the state and federal constitutions.

■ In *Ainsworth v. Calderon,* 138 F.3d 787, 795 (9th Cir.1998), the Ninth Circuit described two types of prejudice—presumed and actual:

> A defendant need only demonstrate one of two different types of prejudice in support of a motion to transfer venue: presumed or actual. Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime. Prejudice is rarely presumed because "saturation" de-

fines conditions found only in extreme situations. To establish actual prejudice, the defendant must demonstrate that the jurors exhibited actual partiality or hostility that could not be laid aside.[5]

(quoting *United States v. Sherwood*, 98 F.3d 402, 410 (9th Cir.1996) (citations and quotations omitted)). This court quoted Justice O'Connor's description of such extraordinary situations in which a trial court should presume bias:

> [I]n certain instances a hearing may be inadequate for uncovering a juror's biases.... While each case must turn on its own facts, there are some extreme situations that would justify a finding of implied bias. Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction.

*State v. Kauhi*, 86 Hawai'i 195, 200, 948 P.2d 1036, 1041 (1997) (quoting *Smith v. Phillips*, 455 U.S. 209, 221–22, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring)) (brackets and ellipsis in original) (emphasis omitted). More relevant to the case at bar, we have declared that "[b]oth the federal and the state constitutions require, as a basic protection of the individual in a criminal case, trial by an 'impartial jury.' Among other things, this requirement means trial by a jury substantially free from the biasing effects of inflammatory pre-trial publicity." *State v. Pokini*, 55 Haw. 640, 641, 526 P.2d 94, 99 (1974) (citations omitted); *see also Okumura*, 78 Hawai'i at 393, 894 P.2d at 91.

■ Like the United States Supreme Court, we have been hesitant to presume prejudice. In *Kauhi*, we warned that trial courts should presume prejudice only in "extreme situations." 86 Hawai'i at 200, 948 P.2d at 1041 (quoting *Smith*, 455 U.S. at 221, 102 S.Ct. 940 (O'Connor, J., concurring)). Thus, an "extreme situation" must present a substantial threat to the defendant's right to a fair trial. In contrast, we have clarified

that "extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair." *State v. Graham*, 70 Haw. 627, 636, 780 P.2d 1103, 1109 (1989) (quoting *Dobbert v. Florida*, 432 U.S. 282, 303, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977)) (internal quotation marks omitted). We then cautioned that "[i]f the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain [a] jury trial under the conditions of the present day." *Id.* at 637, 780 P.2d at 1109–10 (quoting *Holt v. United States*, 218 U.S. 245, 251, 31 S.Ct. 2, 54 L.Ed. 1021 (1910)) (brackets in original) (internal quotation marks omitted).

### 1. *Ainsworth Factors*

In *Ainsworth*, the Ninth Circuit outlined three factors to consider in determining whether prejudice should be presumed:

> Among the factors to be considered in a presumed prejudice argument is whether there was a barrage of inflammatory publicity immediately prior to trial amounting to a huge ... wave of public passion. An additional factor is whether the media accounts were primarily factual, as such accounts tend to be less prejudicial than inflammatory editorials or cartoons. A final factor is whether the media accounts contained inflammatory, prejudicial information that was not admissible at trial.

138 F.3d at 795 (citations and internal quotation marks omitted). Likewise, we have considered these elements. *See Graham*, 70 Haw. at 638, 780 P.2d at 1110 (first factor); *Pokini*, 55 Haw. at 642, 526 P.2d at 99 (citing *United State v. Tropiano*, 418 F.2d 1069, 1079–80 (2d Cir.1969)) (first factor); *State v. Wakinekona*, 53 Haw. 574, 579–80, 499 P.2d 678, 682 (1972) (third factor); *Hashimoto*, 46 Haw. at 187, 377 P.2d at 732 (second factor).

Applying these factors to the present case demonstrates that Pauline's trial was fundamentally fair.

---

**5.** Federal Rules of Criminal Procedure Rule 21(a) uses identical language as its Hawai'i counterpart, HRCP Rule 21(a).

■ First, with respect to the amount and timing of the media accounts, there was a large number of articles spanning eight years, with new articles continuing to be published immediately prior to trial. Such pervasive publicity is evidenced by the publication of hundreds of articles [6] concerning either Pauline or Ireland's murder. In fact, in 1997, the *Hilo Tribune Herald* proclaimed Ireland's murder as the island's top story of the year. The trial started in July of 1999, and even in January of that year, articles about this case were being published.

Second, the media accounts were predominantly factual. Almost all of the articles simply described the facts without passing judgment.[7] Moreover, even the editorials focused on the case dragging on, and the need for more investigative work rather than denouncing and demonizing Pauline. In addition, the lone cartoon adduced by Pauline does not even refer to Pauline. Though there was much public outrage over the crime itself,[8] the media accounts regarding Pauline were largely neutral, with some even presenting Pauline's views. Such a general lack of obvious bias may be explained by the fact that Pauline was not indicted until over five years after the murder. The United States Supreme Court observed in *Patton v. Yount*, 467 U.S. 1025, 1034, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), that "time soothes and erases," and quoted the Seventh Circuit's decision in *Irvin v. Dowd*, 271 F.2d 552, 561 (7th Cir.1959) (Duffy, J., dissenting), *rev'd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), in stating that "[t]he passage of time is a great healer and public prejudice might have subsided."

Third, with regard to inadmissible, prejudicial information, the articles mentioned Pauline's criminal record, including the fact that he had been indicted for child rape and was currently serving a ten-year prison term for raping a woman. One article even noted that he had never married, but had fathered three sons. This court has stated, however, that "juror exposure to information about a . . . defendant's prior convictions or to news accounts of the crime with which he is charged alone [does not] presumptively deprive [ ] the defendant of due process." *Graham*, 70 Haw. at 636–37, 780 P.2d at 1109 (quoting *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975)) (internal quotation marks omitted). Although Pauline's confession to the crime was published, that fact is irrelevant to this analysis since the confession was admissible at trial.

Because the nature of the media accounts was primarily factual, we are unable to conclude that this case is one of those "extreme situations" requiring a presumption of prejudice.

### 2. *Consideration of the Jury Selection Process*

In addition to the three *Ainsworth* factors, we have followed the United States Supreme Court's lead in examining the jury selection process to determine whether to presume prejudice. *See Mu'Min v. Virginia*, 500 U.S. 415, 429, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991); *Murphy*, 421 U.S. at 803, 95 S.Ct. 2031; *Irvin*, 366 U.S. at 727, 81 S.Ct. 1639. For example, in *Wakinekona*, adverse media accounts "created an atmosphere endangering defendant Kaahanui's right to a fair trial." 53 Haw. at 579, 499 P.2d at 682. We then noted, "But the issue is not whether the newspaper accounts were in and of themselves inflammatory but whether the trial judge took sufficient steps to shield the proceedings from the prejudicial effect of the publicity." *Id.; see also id.* at 579–80, 499 P.2d at 682, *cited in Pokini*, 55 Haw. at 642,

---

6. Although Pauline claims that there are over 875 pages documenting the newspaper coverage, this actually overstates the number of articles because approximately 375 pages are duplicates of articles.

7. The extent of the potentially damaging media accounts was limited to one article labeling Pauline a "longtime criminal" after describing his criminal record, and another calling him a "convicted sex offender." Other media accounts merely reported statements by the prosecutor ("walking crime wave") and Pauline's grandmother ("a liar, a thief and spoiled little brat").

8. For example, a reward fund was established which raised over $12,000 from people all over the state. In addition, the legislature introduced an "Ireland bill" to toughen the state's murder laws.

526 P.2d at 99 ("[T]he amount and nature of pre-trial publicity directly determine the lengths to which a trial judge must go on voir dire to assess the possibility of prejudice resulting from that publicity."). *Cf. Maine v. Superior Court of Mendocino County,* 68 Cal.2d 375, 380, 66 Cal.Rptr. 724, 438 P.2d 372, 375 (1968) ("It has long been the practice ... to permit the trial court to defer its final ruling on a motion for a change of venue until the jury is empaneled. The trial court can thereby take into consideration any unanticipated difficulties encountered during [v]oir dire examination of prospective jurors.") (citation omitted).

■■■■■ Although we observed "substantial" adverse pre-trial publicity in *State v. Pokini,*[9] rather than presuming prejudice and requiring the transfer of that case to another circuit, we concluded, "Given the quantity, quality, and timing of this pre-trial publicity, it was incumbent on the trial judge to conduct a thorough-going examination of veniremen who indicated they had been exposed to it." 55 Haw. at 643, 526 P.2d at 100; *see also State v. Keliiholokai,* 58 Haw. 356, 358–59, 569 P.2d 891, 894 (1977). We explained that "[w]here pre-trial publicity is as extensive and as likely prejudicial as it was here, the constitutional right to an impartial jury requires examination into objective as well as subjective indicia of non-prejudice." *Pokini,* 55 Haw. at 644, 526 P.2d at 100. In other words, on voir dire, the court should ascertain "*what* information the jurors had accumulated." *Id.* (citing *Silver-*

thorne v. United States, 400 F.2d 627, 638 (9th Cir.1968), cert. denied, 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1971)) (emphasis in original). Specifically, the trial judge cannot rely solely on "perfunctory and generalized questions" regarding prospective jurors' "subjective ability to ignore pre-trial publicity and be fair and impartial." *Id.* Rather, the trial judge must inquire into objective indicia such as "the extent and nature of the specific matters of publicity to which jurors had been exposed."[10] *Id.*

■■■ In contrast, the Ninth Circuit has recently drawn a sharp distinction between actual and presumed prejudice by relating only the former, not the latter, to inadequate voir dire. *See Ainsworth,* 138 F.3d at 795. Nevertheless, we refrain from adopting such a rigid dichotomy between actual and presumed prejudice. Consideration of jury selection in cases concerning presumed prejudice acknowledges the very real interaction between presumed and actual prejudice: through the voir dire process, the court is better able to ascertain the tenor of the community. Indeed, this interrelationship stems from the principle of our legal system that jurors serve as representatives and "express the sense of the community." *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 40, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991).

Moreover, we have considered the use of peremptory challenges in determining whether prejudice should be presumed:[11]

---

9. The defendants pointed to dozens of newspaper articles, as well as radio and television coverage, concerning the trial. These media accounts included photographs of appellants in handcuffs and reports of their alleged courtroom outbursts. One *Honolulu Advertiser* article stated that Pokini was "the picture of a slow-witted oaf with barely enough intelligence to tie his own shoelaces." *Pokini,* 55 Haw. at 642, 526 P.2d at 100. Publicity lasted for almost four months and ran all the way up to about two weeks before the start of trial. *See id.*

10. We note that the trial court has "wide discretion" with respect to such objective questioning because "[t]he judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror." *Mu'Min,* 500 U.S. at 427, 111 S.Ct. 1899.

11. The fact that defense counsel failed to exhaust all peremptory challenges does not necessarily indicate that an existence of so great a prejudice does not exist:

> Defense counsel ... is placed in an unnecessarily awkward position: unless he exhausts all his peremptory challenges he cannot claim on appeal, in the absence of a specific showing of prejudice, that the jury was not impartial. Yet, convinced that he must go to trial because his motion for a venue change was at first denied and in all likelihood will not ultimately prevail, he may fail to use every peremptory challenge sensing that the jurors he has examined may be comparatively less biased than others who might be seated were his peremptory challenges exhausted.

*Maine,* 68 Cal.2d at 380, 66 Cal.Rptr. 724, 438 P.2d at 375–76 (citation omitted). Though this factor is not dispositive, it is still helpful in determining whether to presume prejudice.

[T]he matter of determining whether local prejudice is so pronounced as to warrant a change of venue to secure a fair and impartial trial for the accused in a criminal proceeding rests in the sound discretion of the trial court. One of the factors generally considered material in such determination is the difficulty in securing an impartial jury. In the case at bar, the record is devoid of any indication that such difficulty existed; a fortiori, defendants had not even exhausted their peremptory challenges when they accepted the jury.

*Hashimoto*, 46 Haw. at 186, 377 P.2d at 732 (citations omitted).

In this case, the prosecution has detailed, without contradiction from Pauline, the trial court's "extraordinary precaution and measures" to ensure that Pauline received a fair trial. First, the trial court issued two questionnaires to prospective jurors specifically addressing pretrial publicity.[12] Second, the judge repeatedly instructed the prospective jurors not to listen to, read, or watch any media account related to this case. Indeed, the trial court excused prospective jurors for failing to obey its instructions. Third, during individual voir dire, the trial court asked prospective jurors in-depth and generally objective questions about pretrial publicity: what details they had learned, from which source, and their reactions to such information. At the close of jury selection, Pauline waived his remaining three peremptory challenges.

Therefore, an examination of the jury selection process in this case, specifically the questionnaires and the individual voir dire, demonstrates that the trial court conducted a "thorough-going examination of veniremen who indicated they had been exposed" to negative publicity, *Pokini*, 55 Haw. at 643, 526 P.2d at 100, and thus, did not abuse its discretion in denying Pauline's motion to transfer.

### B. *Reconstruction Videotape*

Pauline asserts that the trial court was required to preview the contents of his expert witness's videotape before ruling on its admissibility. According to Pauline, the trial court's exclusion of the tape was based upon Hawai'i Rules of Evidence (HRE) Rule 403. Thus, in order to properly exercise its discretionary authority to admit or reject the videotape as evidence, the trial court must view the tape to determine its likely effect on the jury. *See Tabieros v. Clark Equipment Co.*, 85 Hawai'i 336, 377, 944 P.2d 1279, 1320 (1997). Consequently, Pauline argues that the failure of the court to do so constitutes plain error affecting his substantial rights—specifically, his right to a fair trial under state and federal law.

Pauline also claims that the court erred in excluding the videotape. Pauline urges two separate grounds for admitting the videotape in evidence. First, the video was admissible as a reconstruction of the car incident based on the prosecution's theory of the case. Second, the video was admissible to illustrate the principles that the reconstruction engineer, James Campbell, used in formulating his opinion that Ireland was not hit by the car.

Contrary to Pauline's assertion that the trial court's exclusion was based on HRE Rule 403, the trial court actually excluded the videotape based on HRE Rule 702.[13] Rule

---

**12.** The first questionnaire was circulated on April 12, 1999 and asked prospective jurors whether they had "read or heard or seen anything about this case or any of the people mentioned." It also asked whether the prospective juror had "any strong beliefs/feelings about serving as juror in this case" and whether there were "any reasons" that the person would be "unable to be a juror in this case." The results were used in framing follow-up questions for individual voir dire. For jury selection, a second questionnaire asked similar questions.

**13.** The trial judge commented, "I'm inclined to limit Mr. Campbell's testimony not to include the computer simulation or any opinion for which he used the simulation as a basis. And the reasons are that I think there are too many variables which make this computer simulation in my opinion unreliable under 702...." After hearing further argument by both parties, the trial judge concluded:

> [I]t's really all the other factors that's elaborated by the [prosecution], speed factors and he himself ran several different speeds, got different outcomes, so I feel very strongly that the reliability is, under these circumstances with this data and these facts, just something that we cannot put in front of the jury so I'm going to stand by my ruling. I'm going to deny the motion....

702 addresses testimony by experts and prescribes, "In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert." Relatedly, HRE Rule 703 focuses on the bases of opinion testimony by an expert. This rule grants the trial court discretion to evaluate the assumptions used by the expert and to "disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." HRE Rule 703.

This court has previously emphasized the importance of foundational trustworthiness of expert testimony:

> The critical inquiry with respect to expert testimony ... is whether such testimony "will assist the trier of fact to understand the evidence or determine a fact in issue...." HRE 702. Generally, in order to so assist the jury an expert must base his [or her] testimony upon a *sound factual foundation;* any inference or opinions must be the product of an explicable and *reliable system of analysis;* and such opinions must add to the common understanding of the jury. *See* HRE Rule 703.

*Fukusaku,* 85 Hawai'i at 472–73, 946 P.2d at 42–43 (quoting *State v. Maelega,* 80 Hawai'i 172, 181, 907 P.2d 758, 767 (1995) (quotation omitted)) (emphases added and deleted) (brackets in original). More specifically, in *State v. Montalbo,* 73 Haw. 130, 140, 828 P.2d 1274, 1280–81 (1992), we listed five factors to ensure that expert testimony is both relevant and reliable:

(1) the evidence will assist the trier of fact to understand the evidence or to determine a fact in issue;

(2) the evidence will add to the common understanding of the jury;

(3) the underlying theory is generally accepted as valid;

(4) the procedures used are generally accepted as reliable if performed properly;

(5) the procedures were applied and conducted properly in the present instance.

*Id.* (quoted in *State v. Samonte,* 83 Hawai'i 507, 533, 928 P.2d 1, 27 (1996); *Maelega,* 80 Hawai'i at 181, 907 P.2d at 767; and *State v. Ito,* 90 Hawai'i 225, 235, 978 P.2d 191, 201 (App.1999)).

■ In this case, the trial court had ample justification for finding that a consideration of these five factors listed in *Montalbo* demanded an exclusion of the reconstruction video. The record reflects the critical assumptions that Campbell made in creating his reconstruction: (1) the speed of the vehicle; (2) the speed of the victim's bicycle; and (3) the position of the victim as she rode her bicycle. An excerpt of the transcript reveals that, even assuming the program used by Campbell was scientifically valid, the inputs, which are vital to the result, were unreliable:

Q (by prosecutor): So the 3 point 5 [miles per hour] that you picked [for the bicycle speed] in this particular program was not based upon any information in this case?

A (by Campbell): None whatsoever.

Q: Other than an assumption made by you?

A: Exactly.

Q: And the position of Dana Ireland's body, when you went to that icon and selected the position of her body, you selected a position which, uh, you assumed again that she was in at the time of impact?

A: That's correct.

. . .

Q: And [changing her position on the bicycle] would be something that could possibly affect the results of this program?

A: It would give you perhaps a different point of impact.

Q: All right. And that would be important for purposes of running this program; correct? This simulation.

A: Of course. You can do anything you can, uh, that you wish to do within, uh, the limits of the program.

. . .

Q: And, again, 20 miles per hour was something that you selected [for the speed of the car]?

A: Yes, I did.

Q: An assumption that you made?

A: Yes, it is.

Q: Not based on any fact or data?

A: None whatsoever.

. . .

Q: One last question. You said that as long as you input data which is within—which is not mathematically impossible, you press the button, it's gonna kick out something?

A: True.

Moreover, the computer reconstruction failed to take into account the critical fact that the car's fender was curved:

Q: [T]he [f]ender of a VW bug is curved; right?

A: Right.

Q: But the contact points that you inserted were plane?

A: Right, yes.

Q: Were flat?

A: Yes.

Q: So, those contact points did not simulate the exact same curved surface of the VW bug; correct?

A: That's true.

Consequently, the record demonstrates that the trial court had sufficient reason to question the reliability, and even relevance, of this reconstruction video.

The Commentary to HRE Rule 703 provides insight to the case at issue:

> A court would not be justified in "admitting in evidence the opinion of an 'accidentologist' as to the point of impact in an automobile collision based on statements of bystanders, since this requirement [that facts or data must be established as reliable in the particular field] is not satisfied."

HRE Rule 703 Commentary (quoting Fed. R.Evid. 703 advisory committee's note). Likewise, even if the reconstruction program used by Campbell was "generally accepted" as "valid" (factor 3 of *Montalbo* ) and "reliable" (factor 4), given the unsupported assumptions of critical inputs made by Campbell, the trial court would be justified in finding that the evidence would not "assist the trier of fact to understand the evidence or to determine a fact in issue" (factor 1), the evidence would not "add to the common understanding of the jury" (factor 2), and the procedures were not "applied and conducted properly in the present instance" (factor 5). *Montalbo,* 73 Haw. at 140, 828 P.2d at 1280–81. Thus, the trial court did not abuse its discretion in excluding Pauline's expert witness's videotape.

■ Because the trial court excluded the reconstruction videotape on HRE Rule 702 grounds, the trial court was not required to view the videotape prior to excluding it. Pauline mistakenly quotes *Loevsky,* 70 Haw. 419, 773 P.2d 1120 (1989) for the broad proposition that "where the admissibility of the contents of a visual recording is at issue in a judicial proceeding, [the Hawai'i Supreme Court] direct[s] that Hawai'i trial courts in the future undertake their best efforts in attempting to view the subject visual recording prior to ruling on its admissibility." Pauline, however, generalizes this court's statement to apply to all situations where a court is determining the admissibility of visual recording in evidence. Nevertheless, as we clarified in *Tabieros v. Clark Equipment Co.,* 85 Hawai'i 336, 377, 944 P.2d 1279, 1320 (1997), the statement in *Loevsky* applies specifically to HRE Rule 403 rulings. The Intermediate Court of Appeals explained the reason for this limited application:

> It is [the unfair prejudice] of the admissibility question that makes previewing the videotape of critical importance. The trial court must view the tape to determine how the jury would react to the videotape's contents in order to properly exercise its discretionary authority to admit or reject the videotape as evidence.

*Lau v. Allied Wholesale, Inc.,* 82 Hawai'i 428, 434, 922 P.2d 1041, 1048 (App.1996) (citing *Hurt v. Coyne Cylinder Co.,* 956 F.2d 1319, 1328 (6th Cir.1992)). Therefore, given that the trial court in this case excluded the videotape based on HRE Rule 702, rather than HRE Rule 403, the trial court did not err by refraining from reviewing the videotape.

## C. Jury Views of the Car and the Trunk Hood "Experiment"

### 1. View as Evidence

Pauline argues that the viewing of the car was not in evidence. We, now, address the issue of the evidentiary status of views.

#### a. Hawai'i Law

In 1962, the *O'Daniel* court stated, "In this jurisdiction a view is not evidence. Its sole purpose is to permit the trier of the facts to have a better understanding of the testimony. A view cannot be employed as a basis for judgment." *O'Daniel v. Inter–Island Resorts, Ltd.*, 46 Haw. 197, 202–03, 377 P.2d 609, 612 (1962) (citing *Von Holt v. Izumo Taisha Kyo Mission*, 42 Haw. 671 (1958)). This rule is justified by two primary reasons: (1) the judgment must be based "upon testimony given in open court," *McCamman v. Davis*, 162 Mich. 435, 127 N.W. 329, 330 (1910) (cited in *Von Holt*, 42 Haw. at 671); *see also First National Bank v. Clifton Armory Co.*, 14 Ariz. 360, 128 P. 810 (1912) (cited in *Von Holt*, 42 Haw. at 671), and relatedly (2) "[a]n appellate court can only review the cold record." *Honolulu v. Cavness*, 45 Haw. 232, 234, 364 P.2d 646, 648 (1961).

#### b. Other Jurisdictions' Law and Legal Scholarship

Like Hawai'i, many other jurisdictions do not consider a view as evidence: "A large number of jurisdictions, probably a majority, holds that a view is not itself evidence, but is only to assist the trier of fact in understanding and evaluating the evidence." 2 *McCormick on Evidence* § 216 (5th ed.1999). *See e.g., Stephenson v. State*, 742 N.E.2d 463 (Ind.2001); *Garrett v. Commonwealth*, 48 S.W.3d 6 (Ky.2001); *State v. Perkins*, 32 Wash.2d 810, 204 P.2d 207 (1949); *American Family Mut. Ins. Co. v. Shannon*, 120 Wis.2d 560, 356 N.W.2d 175, 179 (1984).

Nevertheless, *McCormick* notes that "[c]ommentators have uniformly condemned the downgrading of views to non-evidentiary status, and a substantial number of courts hold a view to be evidence like any other." *Id.* at § 216 (citing articles and cases). In fact, in repealing its long-established ban on treating a view as evidence, the United States Court of Appeals of the First Circuit recently declared that though the majority position may be that a view is not evidence, "the momentum appears to be headed in the opposite direction":

> Indeed, most of the usual commentators on matters of evidence either question the rationale for excluding views from evidentiary status, observe that that position has lost favor, or both. *See McCormick on Evidence* § 216, at 29 (the "preferable" position is that a view is "evidence like any other"); 22 Charles Alan Wright & Kenneth W. Graham Jr., *Federal Practice and Procedure* § 5176, at 141 (1978) ("The notion that a view is not 'evidence' has been discredited by the writers, and explicitly rejected by one modern code.") (citations omitted); 2 Joseph McLaughlin, ed., *Weinstein's Federal Evidence* § 403.07[4] (2d ed. 1999) ("[T]he modern position is that the view does provide independent evidence."); 4 John Henry Wigmore, *Wigmore on Evidence* § 1168, at 391, 388 (1972) (referring to the "unsound theory" that a view "does not involve the consideration of evidence by the jury" and noting that "it has in most jurisdictions been repudiated"). *Cf.* John M. Maguire, *Cases and Materials on Evidence* 141 (1973) (noting that courts are divided on the question but not taking a position).

*United States v. Gray*, 199 F.3d 547, 548–49 (1st Cir.1999).

Indeed, an examination of the two primary reasons cited for not considering a view as evidence—(1) the need for evidence to be given in the courtroom, where there are procedural safeguards, and (2) the need for a record in case of appeal—reveals that there is little to reasonably justify such a rule.

#### i. Procedural Safeguards

First, the need for evidence to be given in the courtroom is primarily premised on precluding dangers associated with a lack of procedural safeguards. *See American Family Mut. Ins. Co.*, 356 N.W.2d at 180. Nevertheless, a trial court can easily address such concern by ensuring that certain procedural

safeguards are in place at a view.[14] *See infra* Section III:C.2.a.

### ii. Record on Appeal

Secondly, the supposed justification regarding the need for a record on appeal has been sharply criticized by courts and legal commentators alike. *McCormick* observes that the rule excluding a view as evidence "undoubtedly rests in large part upon the consideration that facts garnered by the jury [15] from a view are difficult or impossible to embody in the written record, thus rendering review of questions concerning weight or sufficiency of the evidence impracticable." *Id.* at § 216; *see also Lillie v. United States*, 953 F.2d 1188, 1191 (10th Cir.1992). Nevertheless, *McCormick* then seriously questions the soundness of such rule through two arguments. First, it notes that the supposed reason regarding the need for a record on appeal "ignores the fact that many other varieties of demonstrative evidence are to some extent subject to the same difficulty." *Id.* Similarly, the Texas Court of Appeals pointedly observed that such concern applied equally to already admissible evidence:

Is it true, or is it a standard test or even a test at all, that the legality and admissibility of evidence depends upon the fact that it must be such as can and must be incorporated into and brought up by the record? We know of no such rule announced by any standard work on the law of evidence. If it be true, then the identification, the pointing out of a defendant in court, is not legitimate or admissible because he cannot

be sent up here with the record. A witness's countenance, tone of voice, mode and manner of expression, and general demeanor on the stand oftentimes influence the jury as much in estimating the weight they give and attach to his testimony as the words he utters, and yet they cannot be sent up with the record[.]

*Hart v. State*, 15 Tex.App. 202, 228 (1883) (internal quotations omitted), *cited in Gray*, 199 F.3d 547 at 549–50. Moreover, this consideration is outweighed by the pursuit of the truth at trial.[16]

*McCormick*'s second argument against the supposed need for a record on appeal is that "it is unreasonable to assume that jurors, however they may be instructed, will apply the metaphysical distinction suggested and ignore the evidence of their own senses when it conflicts with the testimony of the witnesses." *Id.* at § 216. *See also* 2 *Weinstein's Federal Evidence* § 403.07[4] (2d. ed.2000) (such distinction is "lost on a jury"); 4 *Wigmore on Evidence* § 1168, at 385–86 (1972 & Supp.2000) (such distinction is "simply not correct in fact"). Indeed, the United States Supreme Court in *Snyder v. Commonwealth* noted "that the knowledge derived from an inspection of the scene may be characterized as evidence." 291 U.S. 97, 113, 54 S.Ct. 330, 78 L.Ed. 674 (1934), *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). In that case, the trial court judge had instructed the jury to treat the view as evidence, in contravention of the state supreme

**14.** Professor H.D. Wendorf has pointed out by way of a porcine analogy: "The fact that pigs will eat gardens is not a really good reason for slaughtering all swine. It may be a perfectly good reason for building fences. It is not a satisfactory basis for killing off the entire pork supply." H.D. Wendorf, *Some Views on Jury Views*, 15 BAYLOR L. REV. 379, 384–85 (1963). Similarly, the proper response to a fear of procedural defects in views is to establish procedural safeguards, not to eliminate completely the consideration of views as evidence.

**15.** For the most part, we use the terms "jury view" and "view" interchangeably. Our discussion regarding views generally applies to all viewings, whether by the judge or by the jury.

**16.** Professor Thomas P. Hardman explained that the primary focus of justice should be on the trial at hand, rather than the possibility of an appeal:
[An] argument against this [alleged need for a record on appeal] is that cases are tried, or should be tried, for the purpose of achieving the best possible results in the first court of record, where most trials end, and should end, even though the achieving of such results must often deprive reviewing tribunals of some of the advantages held by the trial court. Because of the inescapable i[m]perfections inherent in a review by an appellate tribunal, this is a price we must pay if we hope to obtain the most socially desirable results in the greatest possible number of cases.
Thomas P. Hardman, *The Evidentiary Effect of a View: Stare Decisis or Stare Dictis?*, 53 W. VA. L. REV. 103, 114 (1951).

court's declaration that a view not be treated as evidence. *See id.* at 104, 121–22, 54 S.Ct. 330. Nevertheless, the court asserted that, in reality, a view must be treated as evidence given its actual impact on the trier of fact: "Even so, [a view's] inevitable effect is that of evidence, no matter what label the judge may choose to give it." *Id.* at 121–22, 54 S.Ct. 330 (citing *Commonwealth v. Handren*, 261 Mass. 294, 158 N.E. 894 (1927); *Wigmore*, vol. 2, § 1168, p. 705 *et seq.*, vol. 3 §§ 1802, 1803 (collating decisions)). Similarly, the First Circuit acknowledged that although other jurisdictions "vary as to whether a view is treated as evidence or simply as an aid to help the trier of fact understand the evidence, . . . such a distinction is only semantic, because any kind of presentation to the jury or the judge to help the fact finder determine what the truth is and assimilate and understand the evidence is itself evidence." *Gray*, 199 F.3d at 549. *See also Lillie*, 953 F.2d at 1190.

Indeed, not considering a view as evidence may very well vitiate the usefulness of having the view in the first place.[17] Likewise, a West Virginia court early on explained that not treating a view as evidence would not only be unfair to the jury, but would also obstruct its pursuit of the truth:

> To instruct . . . [the jury] to disregard everything they saw, and every impression they derived from the view, would be to mislead them, because it is apparent that the view would be absolutely useless, and would not conduce to a "just decision," if both sight and apprehension were to be closed against the results naturally to be derived from an inspection of the premises.

*Fox v. Baltimore & Ohio Ry.*, 34 W.Va. 466, 12 S.E. 757, 762 (1890) (citations omitted).

Moreover, given the advancement in technology, recording a view today is much easier and more comprehensive. In justifying its recent change of treating a view as evidence,

the First Circuit pointed out the court's ability to employ technological innovations:

> [T]he rationale for [not considering a view as evidence] increasingly lacks force as technology advances. The position that a view should not be considered evidence appears to derive from a concern that the "facts" gathered by the jury from an on-the-scene observation cannot be made part of the record for purposes of appeal. A record of a view can be made, however, through the use of video or other photographic equipment, as well as through transcription of any remarks made.

*Gray*, 199 F.3d at 549–50 (quoting *Hart*, 15 Tex. Ct.App. at 228) (citations omitted).

### iii. Avoidance of Arbitrary Exclusion of Evidence

The very definition of a view favors treating it as evidence. *Black's Law Dictionary* defines a "view" as "the act or proceeding by which [a] tribunal goes to an object which cannot be produced in court because it is immovable or inconvenient to remove, and there observes it." *Black's Law Dictionary* 1568 (6th ed.1990). Likewise, *McCormick* notes that the only reason that a trier of fact views the object outside of the courtroom is that it is too large to be brought into the courtroom:

> The courts, like the prophet, have sensibly recognized that if a thing cannot be brought to the observer, the observer must go to the thing. Venturing forth to observe places or objects which are material to litigation but which cannot feasibly be brought, or satisfactorily reproduced, within the courtroom, is termed a "view."

*McCormick* at § 216. Assuming that proper safeguards are implemented, *see infra* Section III.C.2.a, there is no legitimate reason to treat large objects differently simply because of their size.[18] In fact, not allowing large

---

17. As Professor Wendorf reasoned, "It would be pointless and largely negate the benefits of a view to send the jury out to view and then instruct that no weight could be given in the jury deliberations to what was perceived at the scene." Wendorf at 393.

18. Professor Wendorf emphasized the arbitrariness and unfairness of excluding objects that happen to be large:

> [C]ourts have long admitted in evidence objects small enough to be brought into the courtroom. The acceptance of photographic evidence plus small objects cannot be successfully distinguished from jury views. If

objects in evidence would likely frustrate the pursuit of truth by the trier of fact. A court wisely noted long ago that it thwarts justice and defies logic for courts to seek the truth only to the extent that it fits through the courtroom doors:

> There can be no difference in the proffer of objects to the jury in the courtroom and such exhibition by taking the jury to view such objects, when they are not susceptible of being brought into court. The reason the jury is taken to view the ground is simply because it is physically impossible to bring it into the courtroom, and it is therefore necessary, in order that the jury may have all of the light obtainable upon the subject to which the inquiry is directed, that it be taken and shown these objects which form a part of the subject of inquiry.

*State v. McCausland,* 82 W.Va. 525, 96 S.E. 938, 939 (1918) (citations omitted).[19]

■ Therefore, we hold that in this jurisdiction, a view constitutes independent evidence. To the extent that *Von Holt v. Izumo Taisha Kyo Mission of Hawai'i* and its progeny are inconsistent with today's holding, they are overruled. Accordingly, the trial court judge in this case properly considered the view of the car as evidence.

### 2. *Procedural Safeguards at a View*

■ The trial court must ensure that certain procedural safeguards are in place to guarantee not only the "accuracy and reliability" of the view, *American Family Mut. Ins. Co.,* 356 N.W.2d at 180, but also, in a criminal case, that defendant's interests are adequately protected, *see generally State v. Kekona,* 77 Hawai'i 403, 409, 886 P.2d 740, 746 (1994).

■ At the outset, the trial court judge has wide discretion in granting or refusing a view. *See McCormick* § 216, § 216 n. 7.

Judges should consider the following factors: (1) the view's importance to the issue at question; (2) the extent to which information from the view could be obtained from other sources; and (3) the extent to which the object or place to be viewed has changed since the controversy arose. *See O'Daniel,* 46 Haw. at 202, 377 P.2d at 612; *American Family Mut. Ins. Co.,* 356 N.W.2d at 179; *McCormick* § 216; 2 *Weinstein's Federal Evidence* § 403.07[4] n. 21 (cases cited). A fourth related consideration within the court's discretion is the timing of the view.[20]

■ When the trial court has decided to allow a view, such inspection should "embody certain fundamental safeguards." *Clemente v. Carnicon–Puerto Rico Management Associates,* 52 F.3d 383, 386 (1st Cir. 1995), *abrogated on other grounds by United States v. Gray,* 199 F.3d 547 (1st Cir.1999). First, counsel should be given the opportunity to be present at the view, although the judge may place limits on counsel's interaction with the subject of the view and the jurors. *See Gray,* 199 F.3d 547 at 550; *Clemente,* 52 F.3d at 386 (citing 2 *McCormick on Evidence* § 216 (4th ed.1992); John R. Allison, "Combinations of Decision–Making Functions, Ex Parte Communications, and Related Biasing Influences: A Process Value Analysis," 1993 *Utah L.Rev.* 1135, 1218–19). Generally, by allowing counsel to be present, the trial court can be assured that "the premises [or object] viewed are in the same condition as when the event occurred, or that the court does not view the wrong premises or objects." *Lillie,* 953 F.2d at 1191 (citing *Highbarger v. Thornock,* 94 Idaho 829, 498 P.2d 1302, 1304 (1972)); *American Family Mut. Ins. Co.,* 120 Wis.2d 560, 356 N.W.2d 175, 179 (1984); *Highbarger,* 498 P.2d at 1304–05.

■ Second, the judge should be

---

the jurors can be shown a small object or a photograph of an object of any size in the courtroom, why not permit them under proper supervision to step outside to see a larger subject? Wendorf at 383.

**19.** Indeed, in this case, the trial court judge commented that the jury would be "examining

[the car] in a different location than the courtroom only because of the size of the item."

**20.** The court should ensure that the view is conducted at a time that would "clarify the situation in the minds of the jurors," without "unduly [ ] emphasiz[ing] the information imparted at the view." Wendorf at 392.

present at the jury view.[21] *See Gray,* 199 F.3d at 550; *Clemente,* 52 F.3d at 386. The judge's presence is especially crucial where testimony or experiments occur.[22]

Third, the "court should employ some method of fully and accurately recording that which transpires at the view, usually by enlisting the attendance of a court reporter." *Clemente,* 52 F.3d at 386 (citation omitted). Such precaution should adequately address the expressed concern regarding a lack of a record on appeal, *see supra* Section III. C.1.b.ii. As described earlier in Section III. C.1.b.ii, technological advancements have dramatically increased trial courts' abilities to record views more accurately.

A fourth safeguard is the defendant's right to be present at a jury view. We discuss this issue in Section III.C.3.

By no means are these four safeguards an exhaustive list. Rather, we recognize full well that "the fact that we now regard a view to be within the category of admissible evidence" may "in the future require special techniques and practices as experience indicates." *Gray,* 199 F.3d at 550.

 On review, a defect in the jury view is treated like a defect in the admissibility of any other evidence: harmless error analysis is applied. *See State v. Gano,* 92 Hawai'i 161, 176, 988 P.2d 1153, 1168 (1999); *see also Gray,* 199 F.3d at 548; *Lillie,* 953 F.2d at 1192. Counsel should timely object to any error. *See Shanghai Investment Co. v. Alteka Company,* 92 Hawai'i 482, 499, 993 P.2d 516, 533 (2000), *overruled on other grounds by Blair v. Ing,* 96 Hawai'i 327, 31 P.3d 184 (2001). The First Circuit observed the importance of counsel objecting to a procedural defect in a view:

> When a judge orders a view but strays from the prophylaxis that should accompany it, an offended party must bring the omissions to the judge's attention in a timeous fashion, and, if necessary, lodge a

formal objection. A party's failure to take appropriate action will, in most cases, foreclose an appeal predicated on the omission of standard safeguards.

*Clemente,* 52 F.3d at 387. In *Snyder,* the United States Supreme Court criticized the judge's statement during the jury view that a gas pump was not present at the homicide. *Snyder,* 291 U.S. at 118, 54 S.Ct. 330 (noting that this "blunder" goes "beyond the bounds of explanation appropriate for showers"). Nonetheless, the Court concluded that "[t]he verdict is not upset for such a cause, if there was no substantial harm." *Id.* (citations omitted). Similarly, in *Devin v. DeTella,* 101 F.3d 1206 (7th Cir.1996), the defendant argued that the trial court judge had erred by being absent and not allowing a court reporter to record the view. While stating that these absences were error, the Seventh Circuit determined that such defects were harmless:

> We do not mean to suggest that the procedures employed by the trial court in the instant case were ideal; the oversight of the trial judge and the presence of a court reporter at the view are generally considered desirable. However, a "procedure does not run afoul of the Fourteenth Amendment because another method may seem to our thinking to be fairer or wiser or to give a surer promise of protection to the prisoner at the bar." [The defendant] has failed to demonstrate that he was prejudiced either by the absence of a court reporter or by the court's failure to appoint an impartial guide-much less that he was denied a fair trial in violation of the Fourteenth Amendment.

*Id.* at 1210 (quoting *Snyder,* 291 U.S. at 105, 54 S.Ct. 330) (citations omitted). Because (1) defense counsel failed to object to such absences, *see id.,* (2) the defendant had an "[o]pportunity ... to learn whatever there was a need to know," *id.* at 1209 (citing *Snyder,* 291 U.S. at 109, 54 S.Ct. 330) (brack-

---

21. Since the view is to be considered evidence, "the same degree of supervision by the judge should be required as that given where the jurors are exposed to any testimony having a bearing on the final decision." Wendorf at 393.

22. Because "it will often be difficult to anticipate the occasions when these conditions will arise," the "proper judicial administration demands the presence and supervision of the judge at the view." Wendorf at 393–94. The judge should also give appropriate instructions regarding jury conduct during such proceeding. *See id.* at 296.

ets in original), and (3) the trial judge had given detailed instructions, which, absent evidence to the contrary, are presumed to have been followed, *see id.* at 1210, the Seventh Circuit deemed the errors harmless.

■ In the case at bar, Pauline contends that his right to counsel was violated during the view. We address this and other procedural oversights by the trial court with respect to the jury views.

■ Counsel was not given the opportunity to be present at the views. Nevertheless, because the primary reason counsel should be present is to ensure the integrity of the object being viewed and there was no such danger here, this error was harmless. First, and most importantly, not only had Pauline himself already identified the car, but Pauline's counsel had also previously inspected the car. Second, both Pauline and the prosecution repeatedly referred to the car that was viewed and treated it as evidence. Indeed, Pauline's expert witness, James Campbell, inspected the vehicle five times, and not only testified at great length about it, but also introduced over forty detailed photographs of the car. Third, counsel failed to object when the trial court stated that no counsel would be present. Fourth, the danger of not having counsel present was drastically reduced by the restriction placed on the views, specifically, that there would be no talking. Fifth, the trial court allowed Pauline's counsel to voice any concerns or objections before and after the jury viewings.[23] Finally, a review of the record in its entirety reveals that Pauline had ample opportunity to controvert the prosecution's claim that the car was involved in the crime. Typically, the concern with an improper view is that the defendant has "no opportunity to cross-examine, to object to the introduction of the evidence, or to rebut the evidence." *Lillie*, 953 F.2d at 1191. Such was not the case here.

■ The judge was not present at the second view, although she had indicated that the viewing would be "done just with the Jurors and the Court." Rather, the judge's two court clerks, who were able to communicate with the judge, accompanied the jury. As mentioned in Section III.B.1, for purposes of effective judicial administration, the judge—not clerks—should be present at the jury view, especially where a jury experiment is allowed. Nonetheless, (1) the clerks were able to communicate with the judge, (2) at least one of the clerks was present with the jury at all times, and (3) the judge had given precautionary instructions before the views, which we presume to have been substantially followed, in the absence of any indication to the contrary, *see State v. Klinge*, 92 Hawai'i 577, 592, 994 P.2d 509, 524 (2000) (quoting *State v. Knight*, 80 Hawai'i 318, 327, 909 P.2d 1133, 1142 (1996) (quotation omitted)). *See also Devin*, 101 F.3d at 1210. Therefore, we hold that the absence of the judge during the second viewing, though inappropriate, was harmless.

■ The trial court also failed to record the jury view properly. With respect to the first jury view, there is no record, or even a summary, of the proceeding. After the second view, the trial court did summarize what had occurred during the jury view for the record. As Professor Wendorf noted, "Even conceding the objection directed to a lack of record . . . it can be adequately answered by providing a summary of the view proceedings in the record." Wendorf at 384. Moreover, though there is no transcript of either jury views, we regard the error as harmless in that there was no conversation to be transcribed. Granted, there was some conduct by the jury, but this was described in the record by the court. In addition, counsel failed to object when given the opportunity to do so.

Another possible concern deals with the timing of these views. The jury viewed the car immediately prior to closing arguments. However, courts have held that decisions such as the timing of a jury view are commit-

---

**23.** The second jury viewing of the car was necessitated by the fact that the gas tank was not in the trunk during the first viewing. Nevertheless, given the fact that Pauline was allowed the opportunity to voice his concerns, the trial court was able to take curative steps through the second viewing.

ted to the trial judge's discretion.[24] *See, e.g., Hampton v. State,* 623 P.2d 318, 319 (Alaska 1981) (citing *Battese v. State,* 425 P.2d 606, 608 (Alaska 1967)).

Here, not only was the car a pivotal part of the case, but also the views were not unduly or unfairly prejudicial at this late phase of the trial inasmuch as numerous photographs of the car had already been admitted into evidence. Thus, the trial court did not abuse its discretion in allowing the views at this time.

Moreover, despite such defects in procedural safeguards, there was overwhelming evidence, aside from the views, that pointed to Pauline's guilt. First, Pauline confessed to multiple parties, including the police. Second, at the scene where Ireland's body was found was a t-shirt soaked with Ireland's blood, which was subsequently identified as belonging to Pauline. Third, a witness who lived across the street from the Schweitzers testified that the brothers did work to the front of the car and painted the car yellow in the days immediately following the alleged murder. Finally, an automobile collision reconstructionist and a forensic pathologist testified that the damage to Ireland was consistent with Pauline's confession. In fact, the views of the car were in large part a validation of the detailed photos of the car, including close-ups of the front trunk and fender, which had already been admitted.[25] Indeed, two photos were admitted in evidence that showed the front trunk, both with and without the gas tank in place. Thus, the defects in the jury views are harmless. *See Gray,* 199 F.3d at 548.

### 3. Another Procedural Safeguard: Defendant's Presence

On appeal, Pauline contends that his right to be present at the jury views was violated. We, next, turn to this issue.

Under Hawai'i law, there is a generalized right to be present at "every stage of trial" by the defendant, pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 43(a). We have generally stated that "[i]t has long been recognized in the American criminal justice system that a defendant has a right to be present at all stages of his trial[,]" *State v. Samuel,* 74 Haw. 141, 154, 838 P.2d 1374, 1381 (1992) (quoting *State v. Okumura,* 58 Haw. 425, 427, 570 P.2d 848, 851 (1977) (citation omitted)) (internal quotation marks omitted), and that "in a proceeding where the jury is present or testimony is given, the defendant's presence is constitutionally required." *Id.; see also State v. Texidor,* 73 Haw. 97, 98, 828 P.2d 280, 281 (1992). Thus, Pauline had a right to be present at the jury view of the car.

However, as with other procedural safeguards, a violation of a defendant's right of presence is subject to harmless error analysis, unless the deprivation, by its very nature, cannot be harmless. *See Rushen v. Spain,* 464 U.S. 114, 117–18, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983); *Snyder,* 291 U.S. at 118, 54 S.Ct. 330. Under this standard, this court must "determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction." *State v. White,* 92 Hawai'i 192, 198, 990 P.2d 90, 96 (1999) (citing *State v. Balisbisana,* 83 Hawai'i 109, 113–14, 924 P.2d 1215, 1219–20

---

**24.** Professor Wendorf also observed the practical necessity of giving the trial judge wide discretion:

> Much may be said for the proposition that requests for views normally should be made prior to the trial. However, in many cases it is impossible to determine in advance whether a view is needed. In such cases, of course, a rule requiring advance requests for views would tend to defeat the ends of justice and fairness toward which the granting of views is directed in the first place. It appears, therefore, that a rigid rule delineating the timing of requests to view is objectionable and to be avoided. In short, the sound discretion of the trial judge should govern the timing of views— with reversal for abuse, of course.

Wendorf at 392.

**25.** Although one could argue that the views were not necessary given that photographs of the car had already been admitted in evidence, this is only one factor to be considered by the trial court in determining whether to allow a view. *See* Section III.B.1. In this case, the other factors favored a view, specifically, the car was an extremely important part of the alleged crimes and the car had not changed substantially since the time of the alleged incident. Moreover, it is not clear that all of the information gained from the view was merely duplicative of the photos in evidence.

(1996)) (internal quotation marks omitted); *see also State v. Estrada,* 69 Haw. 204, 227, 738 P.2d 812, 828 (1987).

An examination of the case at bar reveals that none of the reasons behind the right of presence are implicated, and accordingly, the court's failure to allow Pauline the right of presence at the two jury views is harmless error. Pauline's presence at the views did not bear "a relation, reasonably substantial, to his opportunity to defend." *Snyder,* 291 U.S. at 105–06, 54 S.Ct. 330. First, the jury viewings entailed of no witnesses to confront. Second, there were no proceedings for Pauline to have "heard" because there was no speaking. Because the court prohibited all talking, "[t]here [was] nothing he could do if he were there, and almost nothing he could gain." *Id.* at 108, 54 S.Ct. 330. Third, given that the car was identified by Pauline and inspected both by Pauline's counsel and an expert witness on multiple occasions, there was minimal, if any, danger of significant changes to the car. *See Lewis,* 365 N.W.2d at 682. The court permitted a second viewing of the car to remedy the fact that the gas tank was missing from the car in first viewing. Additionally, Pauline had already pointed out the changed color of the car and the absence of fenders. *A fortiori,* in this case where not only did Pauline introduce over forty detailed photographs of the car as evidence but also personally identified the car as being involved in the alleged crime, Pauline's absence at the view did not constitute substantial prejudice. Fourth, the trial court allowed Pauline's counsel to voice any concerns or objections before and after the jury viewings. Finally, a review of the record in its entirety reveals that Pauline had ample opportunity to refute the prosecution's claim that the car was involved in the crime.

Thus, given that views are considered evidence, and that the general rule is that the defendant must be present when evidence is adduced, the circuit court erred by denying Pauline the ability to be present at the jury view of the car. Nonetheless, such error proved to be harmless, given the analysis above.

### 4. *Experimentation*

Pauline claims that the jury improperly conducted an experiment. Therefore, he argues that the jury's consideration of such "non-evidentiary 'materials'" violated his rights of due process, confrontation, and counsel.

Although we have previously discussed jury experiments during unauthorized views, *see Carpenter v. Honolulu Rapid Transit Co.,* 35 Haw. 761 (1940); *Medeiros v. Udell,* 34 Haw. 632 (1938), we have not yet addressed experiments during an authorized view. Just as courts allow jury interaction with objects admitted in evidence, the trial court may similarly allow such interaction at a jury view. As the First Circuit noted, the trial court may, "[i]n the exercise of sound judicial discretion[,] ... permit the conduct of experiments at the view." [26] *Clemente,* 52 F.3d at 388 n. 4.

Granted, reasonable minds could differ as to the line demarcating an "experiment" from a "careful inspection of an exhibit." The dispositive issue, however, is not what conduct qualifies as an "experiment," but rather whether the conduct led to the production of "new" evidence. Accordingly, we avoid "the tyranny of labels," *Snyder,* 291 U.S. at 114, 54 S.Ct. 330, and, rather, focus on this essential issue.

Generally, experiments are prohibited "only where the result is the production of 'new' evidence," specifically, "evidence which ... is not possible for the party injured to meet, answer, or explain." *People v. Cooper,* 95 Cal.App.3d 844, 853, 157 Cal.Rptr. 348, 353 (1979) (citation omitted). "[W]hile we do not condone freewheeling experimentation on the jurors' part during a view,"

26. In arguing that the trial court may allow experiments at a view, Professor Wendorf reasoned that "improvement in the conduct of litigation may be achieved by the judicious utilization of all reasonable sources of information by the triers of fact." Wendorf at 394. Indeed, given that "the use of scientific evidence has progressed favorably," according to Professor Wendorf, "only the lazy, the inept or the advocate of a weak cause should fear the properly supervised conduct of an experiment at the scene in dispute." *Id.* at 394–95.

*Clemente*, 52 F.3d at 388, the jury "may carry out experiments within the lines of offered evidence" or "which amount to no more than a careful examination of the evidence which was presented in court." *Cooper*, 95 Cal.App.3d at 853–54, 157 Cal.Rptr. at 353 (citations omitted); *see also McCormick* § 217. If the jury conducts an experiment that produces "new" evidence, the court must then examine whether the defendant was thereby denied his or her right to a fair trial by an impartial jury. *See State v. Keliiholokai*, 58 Haw. 356, 358, 569 P.2d 891, 893–94 (1977) ("The jury's verdict must be based upon evidence received in open court and not from outside sources.") (citation omitted). In other words, it must determine whether the defendant was substantially prejudiced as a result. *See Okumura*, 78 Hawai'i at 394, 894 P.2d at 92 (citing *Keliiholokai*, 58 Haw. at 360, 569 P.2d at 895).

■ At issue here is the placement of the trunk hood on the front trunk and the subsequent opening and closing of the trunk hood.[27] Just as the jury was allowed to open and close the door of the car, it was also able to open and close the trunk hood. The jury's conduct in this case did not result in new evidence. Here, the jury's "experiment" was merely an examination of the car and trunk hood being viewed with respect to Detective Steven Guillermo's testimony about Ireland fitting in the trunk. The trial court should expect a conscientious jury to examine closely the car and testimony as they relate to each other. After all, exhibits and testimony are not admitted in a vacuum. *Cf. Cooper*, 95 Cal.App.3d at 854, 157 Cal.Rptr. at 354. Because this experiment did not lead to new evidence, there was nothing for Pauline to "meet, answer, or explain," *id.* at 853, 157 Cal.Rptr. at 353, and, consequently, there is no way for Pauline to show that he had been

substantially prejudiced. Indeed, the only potential bearing the "experiment" had on Pauline's guilt was whether Ireland's body could fit in the trunk. The opening and closing of the trunk hood added little, if anything at all, to this question because the jury had already viewed the trunk itself and photos of the trunk hood closed on the front trunk; and an exhibit detailing the car's dimensions had been admitted into evidence. Moreover, even after being informed of the jury's conduct, Pauline failed to object. Thus, the jury experiment with respect to the trunk hood was allowable because it did not produce new evidence and, thus, did not substantially prejudice Pauline.

### D. *Prosecution's Withdrawal of Included Offenses Without On–The–Record Colloquy*

Pauline asserts that manslaughter and assault in the first degree are included offenses of murder in the second degree. Thus, Pauline urges that the trial court's failure to engage in an on-the-record colloquy with him regarding the withdrawal of the included offense instructions was plain error affecting his substantial rights and denying him a fair trial.[28]

Since defense counsel did not object to the alleged error at trial, we must review the issue under the plain error standard. *Pinero*, 75 Haw. at 291–92, 859 P.2d at 1374 ("Ordinarily, instructions to which no objection was made at trial may not be raised as error on appeal[; however,] . . . [w]here an erroneous instruction affected the substantial rights of a defendant, . . . we may notice the error as 'plain error[.]'").

In *State v. Kupau*, 76 Hawai'i 387, 395, 879 P.2d 492, 500 (1994), *overruled by State v. Haanio*, 94 Hawai'i 405, 16 P.3d 246 (2001),[29]

---

27. As described in Section III.C.2, the trial court judge should be present to supervise an experiment. Nevertheless, in this case, such error was harmless.

28. Specifically, Pauline argues that manslaughter and assault in the first degree are included offenses of murder in the second degree, that assault in the second degree and in the third degree are included offenses of murder in the second degree, and that sexual assault in the

second degree, third degree, and fourth degree are included offenses of sexual assault in the first degree.

29. The analysis in this case is unaffected by *Haanio*, 94 Hawai'i 405, 16 P.3d 246, because that case: (1) only applies prospectively, *see id.* at 407, 407 n. 1, 16 P.3d at 248, 248 n. 1, and (2) still requires a "rational basis in the evidence" for giving an included offense instruction, *id.* at 407, 16 P.3d at 248.

this court held that a "trial judge must bring all included offense instructions that are supported by the evidence to the attention of the parties." Alternatively, "a trial court 'is not obligated to charge the jury with respect to an included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting him of the included offense.'" *Id.* at 390, 879 P.2d at 495 (citing HRS § 701–109(5) (1985)). In *State v. Kinnane*, 79 Hawai'i 46, 49, 897 P.2d 973, 976 (1995) (citation omitted) (emphasis added), we further declared, "Indeed, in the absence of such a rational basis in the evidence, the trial court *should not* instruct the jury as to included offenses." Thus, the trial court's obligation to instruct the jury on manslaughter and assault, assuming they are included offenses, depends on whether the jury could have rationally acquitted Pauline of murder in the second degree and convicted him of either manslaughter or assault. *See Haanio,* 94 Hawai'i 405, 16 P.3d 246.

 Given the facts of this case, there is no rational basis to support the contention that the jury could have rationally acquitted Pauline of second degree murder and convicted him of manslaughter or assault. Even if there had been a rational basis to instruct the jury with respect to an offense included within second degree murder, the circuit court's erroneous failure to do so would nevertheless have been harmless because the jury found Pauline guilty of murder beyond a reasonable doubt. As we held in *Haanio,* the failure to instruct the jury on an included offense

> is harmless when the jury convicts the defendant of the charged offense or of an included offense greater than the included offense erroneously omitted from the instructions. The error is harmless because jurors are presumed to follow the court's instructions, and, under the standard jury instructions, the jury in reaching a unanimous verdict as to the charged offense or as to the greater included offense, would not have reached, much less considered, the absent lesser offense on which it should have been instructed.

*Haanio,* 94 Hawai'i at 415–16, 16 P.3d at 256–57 (internal quotations, brackets, and citations omitted). Thus, the circuit court did not err by failing to engage in an on-the-record colloquy with Pauline before excluding the included offense instructions.

### E. Trial Court's Denial of Pauline's Motion for a New Trial

Pauline contends that the trial court abused its discretion by rejecting his motion for a new trial. He argues that the trial court denied him the opportunity to make a prima facie showing of juror misconduct and improperly shifted the burden of proving whether the misconduct was harmless beyond a reasonable doubt from the prosecution to him.

 In *Furutani,* 76 Hawai'i at 179, 873 P.2d at 58, we stated that "[a] fair trial by an impartial jury is guaranteed to the criminally accused" under the state and federal constitutions. We then established the proper framework for dealing with a defendant's claim in a criminal case that his or her right to a fair trial by an impartial jury has been violated:

> [T]he initial step for the trial court to take . . . is to determine whether the nature of the [alleged deprivation] rises to the level of being substantially prejudicial. If it does not rise to such a level, the trial court is under no duty to interrogate the jury. . . . And whether it does rise to the level of substantial prejudice . . . is ordinarily a question committed to the trial court's discretion.

*Id.* at 180, 873 P.2d at 59 (quoting *State v. Keliiholokai,* 58 Haw. 356, 359, 569 P.2d 891, 895 (1977)) (internal quotation marks omitted) (brackets in original). The defendant must first make a prima facie showing of a deprivation that " 'could substantially prejudice [his or her] right to a fair trial' by an impartial jury." *Id.* at 181, 873 P.2d at 60 (brackets in original). We also suggested that the defendant should "first present some specific, substantial evidence showing a juror was possibly biased." *Id.* (quoting *Lopez v. State,* 527 N.E.2d 1119, 1130 (Ind.1988)) (internal quotation marks omitted). Once the defendant has satisfied this burden, the trial

court then determines whether the nature of the alleged deprivation rises to a level of being substantially prejudicial. If the trial court determines that the alleged deprivation is substantially prejudicial, the trial court then becomes "duty bound to further investigate the totality of circumstances surrounding the [alleged deprivation] to determine its impact on jury impartiality." *Id.* at 181, 873 P.2d at 60 (brackets in original) (citation omitted).

In this case, Pauline alleges that an alternate juror, Marveen Teresa Miller, had predeliberation discussions with jurors who actually deliberated. This claim is based completely on the assertion that in a post-trial discussion, Miller told Pauline's counsel, Clifford Hunt, and Pauline's investigator, Dan Boe, that:

(1) *We* believed no one would confess to a murder that they did not commit,

(2) *We* believed [Ireland]'s body would fit in the Volkswagen's trunk,

(3) *We* believed the Volkswagen was involved, and

(4) *We* believed Ken Baker.

In his Reply Brief, Pauline contends that even though Miller later clarified that she meant "I" when she said "we" in reference to her comment about the victim's body fitting in the trunk, she failed to indicate expressly that this also applied to the other three statements.

Both the prosecution's and Pauline's investigators' reports reflect that Miller intended her explanation to apply to all, rather than just one, of her comments. The prosecution's investigator, William Perreira, recorded Miller's explanation that "if she used the word 'we' in speaking with Dan Boe and Clifford Hunt that she was speaking for herself and not referring to the other jurors. She said that she was talking about her own feelings and not the feelings of others." Similarly, though less explicitly, Pauline's investigator wrote:

I introduced myself to Ms. Miller and advised that we wished to set up an appointment for an interview. Ms. Miller asked what the purpose of the interview was and I explained that there were several areas

that Mr. Hunt needed clarification on. She asked what areas and I told her that one example was her use of the word "we" when talking to us after the verdict had been read. As further explanation I advised her that she had stated "we believed the body would fit in the trunk of the Volkswagen."

Ms. Miller said that she did not recall everything that she said to us on that day, but that if she used the word "we" it would only be in reference to her or her feelings. Given (1) the statement's structure and context, and (2) the admitted fact that Miller did not even remember the four statements, Pauline's argument that Miller's alleged statements establish a prima facie showing of a substantially prejudicial deprivation of a fair trial is, at best, weak and strained. Because Pauline failed to present specific, substantial evidence of possible juror misconduct, the trial court did not abuse its discretion in denying Pauline's motion for a new trial.

## IV. CONCLUSION

Based on the foregoing discussion, we affirm the trial court's judgment of conviction and sentence.

Concurring Opinion of ACOBA, J.

I concur in the opinion, except I believe the proposed safeguards with respect to a jury view must be mandatory rather than discretionary. I fear the discretionary terms with which this court directs that views are to be undertaken will only spawn in the future, further appeals on whether some, or all, of the safeguards should have been undertaken, or that other steps obviously necessary were required. In my view, the salutary approach would be to require the steps recommended be followed in order to promote uniformity and consistency in our trial courts; a course that I believe in the long run and in the great number of cases will promote the administration of justice.

We have mandated similar procedures before. *See Tachibana v. State,* 79 Hawai'i 226, 236, 900 P.2d 1293, 1303 (1995) ("[I]n order to protect the right to testify under the Hawai'i Constitution, trial courts must advise criminal defendants of their right to testify

and must obtain an on-the-record waiver of that right in every case in which the defendant does not testify."). Where we have not, as in urging the trial courts to appropriately advise defendants in jury trial waivers, *see* *State v. Friedman*, 93 Hawai'i 63, 69, 996 P.2d 268, 274 (2000) (holding that trial courts should inform defendants that "(1) twelve members of the community compose a jury, (2) ... defendant[s] may take part in jury selection, (3) ... jury verdict[s] must be unanimous, and (4) the court alone decides guilt or innocence if ... defendant[s] waive[ ] a jury trial"), the appellate courts and the parties have had to continually revisit the problem. *See State v. Bush*, No. 24808, 2002 WL 31302086 (Haw. Oct. 11, 2002) (SDO) (Acoba, J., dissenting) ("This court has advised the trial courts to engage in a colloquy to aid in ensuring voluntary waivers of the right to jury trial." (Brackets, internal marks and quotations omitted.)); *State v. Kaupe*, 96 Hawai'i 71, 26 P.3d 29 (2001)(SDO) ("This court has rejected the proposition that a jury waiver can never be voluntary and knowing if a trial court fails to engage a defendant in a specific colloquy." (Quotation marks omitted.)); *State v. Valdez*, 98 Hawai'i 77, 79, 42 P.3d 654, 656 (App.2002) (vacating the judgment and urging that the trial court should, in open court, directly inform the defendant that "(1) twelve members of the community compose a jury, (2) the defendant may take part in jury selection, (3) a jury verdict must be unanimous, and (4) the court alone decides guilt or innocence if the defendant waives a jury trial." (citations omitted)). The mandatory requirements would still be subject to harmless error analysis as is a violation of the defendant's right to be present at a view. Thus, mandating that the safeguards be followed would not detract from our ultimate review.