UNITED STATES of America,
Appellee,

v.

Sean GRAY, Defendant, Appellant.

No. 99–1189.

United States Court of Appeals,
First Circuit.

Heard Sept. 17, 1999.

Decided Dec. 23, 1999.

Bjorn Lange, Assistant Federal Defender, for appellant.

Mark E. Howard, Assistant U.S. Attorney, with whom Paul M. Gagnon, United States Attorney, was on brief for appellee.

Before BOUDIN, Circuit Judge,
COFFIN and CAMPBELL, Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

Appellant Sean Gray was convicted by a jury on one count of bank robbery and sentenced to 71 months in prison. His sole claim on appeal is that the district court committed prejudicial error when it instructed the jury that its view of the robber's escape route was not evidence in the case. Although we acknowledge that a jury view may at times be treated as evidence, we find no reversible error and therefore affirm appellant's conviction.

I. *Factual Background*

The Community Bank and Trust in Exeter, New Hampshire, was robbed shortly after 1 p.m. on June 23, 1998. Bank employees described the lone robber as a male with a goatee and "Fu Manchu" mustache who was wearing mirrored sunglasses and a blue hooded sweatshirt. He approached the center teller window, pulled a bag from under the sweatshirt, and said, "This is no joke; give me your money." Two bank employees described the robber as having a significant limp. He "left in a hurry" and was seen running across the street, along railroad tracks, and then up a hill toward a bridge that passes over the tracks near Park Street (the "Park Street bridge"), where he ap-

parently was picked up by a woman in a white car with Florida license plates. A teacher who lives near the Park Street bridge saw a man emerge from the footpath near the railroad tracks and described him as having a very distinct gait irregularity, or limp. The man was clutching a bag at the time. Police found a blue hooded sweatshirt on the footpath leading up to Park Street and a pair of shattered mirrored sunglasses on the street where the white vehicle had been parked.

Gray was arrested a week later and charged with bank robbery. The district court granted Gray's unopposed motion seeking to allow the jury to view the bank and the robber's escape route, but refused his requested instruction that the jury consider the view as evidence. Instead, the court advised the jurors that their view of the bank and surrounding area was not evidence, explaining that it was "intended simply to provide you with points of reference or a context in which to consider the evidence in this case."

Defense counsel objected to the instruction, though recognizing that it was consistent with First Circuit case law. In *Clemente v. Carnicon–Puerto Rico Management Assocs.*, 52 F.3d 383 (1st Cir. 1995), we stated that "the rule in this circuit is that a view does not itself constitute or generate evidence," *id.* at 386, reflecting the widely adopted position that a view is permitted in the discretion of the trial judge "only to assist the trier of fact in understanding and evaluating the evidence" introduced in court, *see* 2 John W. Strong et al., *McCormick on Evidence* § 216, at 29 (5th ed.1999).

On appeal, Gray argues that the language in *Clemente* was dictum, and therefore not binding, and that, in any event, it is illogical as well as incorrect by contemporary standards to exclude a view from consideration as evidence. He argues that he is entitled to a new trial because the view was integral to his defense and the court's instruction unfairly prejudiced him. He had attempted at trial to prove that he

could not have been the robber because a work-related leg injury left him physically incapable of fleeing quickly along the uneven, hilly escape route that the robber had followed. He maintains that the court's instruction precluded him from relying on the jury's own experiences with the difficult terrain to support his doctor's testimony that he could not have covered the route as quickly as the robber.

Our review of the relevant law and commentary now leads us to conclude that it is unrealistic to exclude a view from the status of evidence in every circumstance. We do not go further in this opinion than to remove this blanket prohibition. But even if the court's instruction on the view was error, it must be deemed harmless because, as we shall explain, it foreclosed very little benefit from the view that a permissive instruction would have allowed, and because the testimonial evidence points so overwhelmingly to the appellant's guilt.

## II. *The Nature of the View*

Although our unconditional statement in *Clemente* that a jury view "does not itself constitute or generate evidence" may represent the majority position, *see* 52 F.3d at 386 & n. 3, the momentum appears to be headed in the opposite direction. Indeed, most of the usual commentators on matters of evidence either question the rationale for excluding views from evidentiary status, observe that that position has lost favor, or both. *See McCormick on Evidence* § 216, at 29 (the "preferable" position is that a view is "evidence like any other"); 22 Charles Alan Wright & Kenneth W. Graham Jr., *Federal Practice and Procedure* § 5176, at 141 (1978) ("The notion that a view is not 'evidence' has been discredited by the writers, and explicitly rejected by one modern code.") (citations omitted); 2 Joseph McLaughlin, ed., *Weinstein's Federal Evidence* § 403.07[4] (2d ed. 1999) ("[T]he modern position is that the view does provide independent evidence."); 4 John Henry Wigmore, *Wig-*

*more on Evidence* § 1168, at 391, 388 (1972) (referring to the "unsound theory" that a view "does not involve the consideration of evidence by the jury" and noting that "it has in most jurisdictions been repudiated"). *Cf.* John M. Maguire, *Cases and Materials on Evidence* 141 (1973) (noting that courts are divided on the question but not taking a position).

Given the invitation to look more closely than was necessary in *Clemente,* we have found no reason to disagree with the experts. Perhaps the most compelling and pragmatic observation is that the distinction between non-evidence that aids a jury's understanding and traditional, independent evidence is "lost on a jury," *see* 2 *Weinstein's Federal Evidence* § 403.07[4]. We agree that it is unlikely that jurors, confronted with testimonial evidence at odds with what they have seen, "will apply the metaphysical distinction suggested and ignore the evidence of their own senses," *McCormick on Evidence* § 216, at 29. The Tenth Circuit has expressed a similar thought:

> We acknowledge that jurisdictions vary as to whether a view is treated as evidence or simply as an aid to help the trier of fact understand the evidence. However, we believe such a distinction is only semantic, because any kind of presentation to the jury or the judge to help the fact finder determine what the truth is and assimilate and understand the evidence is itself evidence. The United States Supreme Court has stated that the "inevitable effect [of a view] is that of evidence no matter what label the judge may choose to give it." *Snyder v. Massachusetts,* 291 U.S. 97, 121, 54 S.Ct. 330, 78 L.Ed. 674 (1934), *overruled on other grounds* . . . .

*Lillie v. United States,* 953 F.2d 1188, 1190 (10th Cir.1992) (footnote omitted); *see also Wigmore on Evidence* § 1168, at 385–86 ("The suggestion that, in a view or any other mode of inspection by the jury, they are merely 'enabled better to comprehend the testimony,' and do not consult an addi-

tional source of knowledge, is simply not correct in fact. . . ."); *Carpenter v. Carpenter,* 78 N.H. 440, 447, 101 A. 628, 631 (1917) (*quoted in* Maguire, at 141 n.3) ("If the object is black when seen by the jury it would be absurd to expect them to find that it was white, in the absence of evidence indicating that they had been imposed upon.").

Moreover, the rationale for the distinction increasingly lacks force as technology advances. The position that a view should not be considered evidence appears to derive from a concern that the "facts" gathered by the jury from an on-the-scene observation cannot be made part of the record for purposes of appeal. *See, e.g., In re Application,* 102 F.R.D. 521, 524 (E.D.N.Y.1984) (Weinstein, C.J.); *McCormick on Evidence* § 216, at 29; 4 *Wigmore on Evidence* § 1168, at 381–82, 385; Thomas P. Hardman, "The Evidentiary Effect of a View: Stare Decisis or Stare Dictis?" 53 W. Va. L.Rev. 103, 113 (1951) [hereinafter "Evidentiary Effect of a View"]. A record of a view can be made, however, through the use of video or other photographic equipment, as well as through transcription of any remarks made. *See In re Application,* 102 F.R.D. at 524; H.D. Wendorf, "Some Views on Jury Views," 15 Baylor L.Rev. 379, 384 (1963) [hereinafter "Jury Views"] ("Even conceding the objection directed to a lack of record . . . , it can be adequately answered by providing a summary of the view proceedings in the record."). Although such a record may not capture every nuance of the experience, that difficulty is equally applicable to other kinds of evidence:

> A witness' countenance, tone of voice, mode and manner of expression, and general demeanor on the stand, oftentimes influence the jury as much in estimating the weight they give and attach to his testimony as the words he utters, and yet they cannot be sent up with the record.

*Hart v. State,* 15 Tex.App. 202, 228 (1883) (cited in "Jury Views," 15 Baylor L.Rev. at 384); *see also* 4 *Wigmore on Evidence* § 1168, at 384–85 (quoting same case); "The Evidentiary Effect of a View," 53 W. Va. Law Rev. at 113 (same).[1]

Precautions, of course, must be taken to minimize problems, because jury supervision is more difficult outside the courtroom. *See* "Jury Views," 15 Baylor L.Rev. at 384–85. Certain of the safeguards we outlined in *Clemente* respond to these concerns, including the recommendation that the judge be present and that limits be placed on the interaction between counsel, the subject of the view, and the jurors. *See* 52 F.3d at 386; *see also* "Jury Views," 15 Baylor L.Rev. at 394, 396 ("[P]roper judicial administration demands the presence and supervision of the judge at the view . . . and definitive instructions to refrain from conversation and independent exploration should be given the jury prior to a view."). Of obvious importance is the court's responsibility to ensure that what transpires at the view is fully and accurately recorded, most likely by a court reporter. *See Clemente,* 52 F.3d at 386.

■ We emphasize that, by recognizing that the information obtained through a view may constitute independent evidence at trial, we do not diminish the trial court's inherent power to decide whether to allow a view at all. Determining if a view is appropriate in a particular situation remains a matter committed to the trial court's informed discretion. *See Clemente,* 52 F.3d at 386.

Moreover, the fact that we now regard a view to be within the category of admissible evidence not only endows a trial court with the same discretion to control its admission that the court has in dealing with all evidentiary matters, but also may in the future require special techniques

and practices as experience indicates. This opinion does not purport to resolve all issues that may arise stemming from the status of a view as evidence; it simply removes the concept of a view from the highly ambiguous state of being something to consider but not evidence. Our holding thus increases the range of admissible evidence but leaves intact the district court's authority to refuse a view in particular cases, or to exclude a view, or portions of it, from evidence when an on-the-scene observation does not transpire as the court had anticipated.

### III. *The View in this Case*

■ Although the district court in this case excluded the view from evidence without considering whether it satisfied the standard requirements of admissibility, its decision does not require reversal of appellant's conviction, because any error unquestionably was harmless. *See United States v. Crochiere,* 129 F.3d 233, 236 (1st Cir.1997).[2] As we explain below, Gray was able to rely on other evidence to attempt to show his inability to traverse the difficult terrain of the robber's getaway path and, though the view was not treated as evidence, the jurors' exposure to the scene presumably influenced their evaluation of what they saw and heard in the courtroom. In addition, considerable evidence pointed to appellant as the bank robber.

### A. *Other evidence of the terrain.*

The government introduced photographs of the railroad tracks and footpath area that had been seen by the jury as part of the view. Although the court's instruction limited defendant's formal use of the jurors' direct exposure to the scene, their first-hand experiences obviously informed their examination of the photographs. In

---

1. · We do not mean to suggest that recording the view is a condition of its treatment as evidence. Our point is only that the concern expressed by some about the problem of creating a record is not without solutions.

2. We hasten to add that we use the term "error" without any criticism intended of the district judge, who was properly following our language in *Clemente.*

reality, the district court's directive that the jury could use the view as a "context" for considering other evidence provided appellant with nearly all he could have expected from using the view as direct evidence. The jurors essentially were encouraged to bring to mind what they had seen when reviewing evidence, including the photographs, relating to the difficulty of the terrain. As we acknowledged earlier in concluding that a view may constitute evidence, the distinction between context and evidence is likely to be lost on the jury in the ordinary case. *See supra* at 549–50. This case seems well within that norm.

Defendant's assertion that the jurors' observations at the scene were not captured equivalently by the photographs and other trial evidence, while perhaps true, thus misses the point. Indeed, defense counsel made multiple references to the view in guiding the jury's recollection of the evidence, noting at one point that the robber ran down the left side of the railroad right-of-way and that, "[a]s you know. from the view, that's the rougher side." At another point, presumably seeking to discount the significance of appellant's leg injury, counsel stated that the jury could find, "based on your view of the path," that the robber might have been seen limping because he twisted his ankle along the way. The degree by which treatment of the view as evidence rather than context would have strengthened appellant's case is thus minimal, particularly in light of the substantial evidence of his guilt, to which we now turn.

### B. *Robbery evidence.*

The evidence that appellant committed the bank robbery included the testimony of eight witnesses who identified him in a bank surveillance photograph, including his mother-in-law and brother-in-law, the latter of whom called police to report that the robber was Gray after seeing a televised picture of the suspect. Three long-time friends also were among those who identified him in the surveillance photograph, and a bank employee, Sue Palmer, testified that the robber was the same man with whom she had spoken in the bank on June 2, 1998. Gray admitted in his testimony that he was in the bank on that date.

The circumstantial evidence included the blue hooded sweatshirt found on the footpath near the railroad tracks, which Gray's brother-in-law identified as resembling one belonging to Gray. As noted earlier, witnesses reported that the robber had worn such a garment. An FBI hair and fiber expert testified that hairs found on the sweatshirt were consistent with samples taken from Gray. The getaway vehicle was identified as white with Florida license plates, and Gray drove a white Suzuki with Florida plates. Both Gray and the robber were described as having a distinctive Fu Manchu style mustache. Several witnesses said the robber had a pronounced limp, and Gray's treating physician acknowledged that Gray would exhibit a significant limp when running. The day after the robbery, Gray paid $310 cash for a room at a Boston hotel, even though he had been receiving welfare assistance to pay for a motel room in New Hampshire for the two weeks before the robbery. Finally, when Gray was arrested at a Manchester, New Hampshire hotel a week after the robbery, a newspaper clipping that named him as a suspect was found on the night stand between the two beds in his room.

.In light of this considerable evidence linking appellant to the crime, and the negligible effect of the court's instruction that the view was not evidence, we conclude that any error in the treatment of the view must be deemed harmless.[3]

---

**3.** While we see no deficiency in the evidence, we add that since the *Clemente* case was on the books prior to this trial, defendant was fully on notice of the risk inherent in relying on the view alone as providing needed "evidence" in the case. If defendant believed the record was lacking in proof of any matter, he could have provided alternative evidence as to

*The judgment of conviction is therefore affirmed.*

the difficulty of the terrain, in the form, for example, of photographs of the scene or testimony by witnesses familiar with the topography.