**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 17, 2005**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

RAUL MANZANO,

      Defendant - Appellant.

No. 04-8096
(D.C. No. 04-CV-70-B)
(D. Wyo.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **O'BRIEN**, and **TYMKOVICH**, Circuit Judges.[**]

      Defendant-Appellant Raul Manzano appeals the district court's denial of his motion to suppress evidence obtained during a search of his vehicle and his subsequent conviction of possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii)(II). In a written order, the district court held the search was lawful on two grounds. First, Mr. Manzano

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1(G). The cause is therefore ordered submitted without oral argument.

voluntarily consented to the search, and second, the officer had reasonable suspicion based on his observations of Mr. Manzano and the vehicle, which ultimately developed into probable cause once a drug-sniffing dog alerted to the outside of the vehicle. I R. Doc. 24. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

Background

At approximately 7:00 a.m. on January 17, 2004, Wyoming State Highway Patrol Trooper Ben Peech was on patrol on I-80 near Cheyenne, Wyoming when his radar detected Mr. Manzano driving 80 m.p.h. The officer stopped Mr. Manzano, informed him he was speeding, and asked for his license and other documentation. During this initial contact, the officer observed that Mr. Manzano's hands were shaking, he was fidgety, and his voice was stammering. He also noticed a strong air freshener scent and that the vehicle, a Ford Expedition, was missing a windshield wiper cover and that the wiper bolt was scarred. II R. at 8. The officer testified that the Ford Expedition is a known drug courier car as it has void space in the vicinity of the wiper housing commonly used to hide contraband. II R. at 10-11.

Mr. Manzano acknowledged he was speeding and produced the requested documents. The officer then asked Mr. Manzano to accompany him to the patrol

car so he could write a warning ticket. Id. at 12-13. While in the patrol car, even after being informed he was only getting a warning, Mr. Manzano remained visibly nervous. The officer questioned him about his travel plans and he explained that he was moving from California to Nebraska to start a business and that he moved back and forth between the two states depending on work. He also stated that even though he had an address in Nebraska, the address on the vehicle registration belonged to his aunt. Id. at 12. The officer then completed the warning, handed back Mr. Manzano's license and vehicle documentation, and told him to "slow down" and "have a great one, ok," Aplt. Br. at 8, and Mr. Manzano exited the patrol car.

However, before he reached his vehicle, the officer re-approached him and asked if he would mind answering some additional questions. Mr. Manzano agreed.[1] Again, the officer questioned him about his travel and business plans. Mr. Manzano stated that he was starting a business with a friend but that he did

---

[1]During the encounter the officer turned his body microphone on and off several times, which Mr. Manzano suggests undermines the officer's credibility. Aplt. Br. at 18. However, the district court credited the officer's explanation for his actions–that because the body microphone and the patrol car microphone do not work at the same time, he turned off the body microphone so the conversations he had with Mr. Manzano in the patrol car and any comments Mr. Manzano might make while sitting alone in the patrol car would be recorded(II R. at 14, 20)–and we must accept the district court's conclusion as it was not clearly erroneous. United States v. Zabalza, 346 F.3d 1255, 1259 (10th Cir. 2003).

not know his friend's phone number or address. He also made inconsistent statements about his travels, first stating that he had not been to Nebraska for six months and then telling the officer that he had purchased and registered the vehicle in Nebraska within the preceding month. Aplee. Br. at 5. The officer noticed that Mr. Manzano was cold and invited him to sit inside the patrol car. Mr. Manzano accepted the invitation, and after a few more minutes of questioning the officer said, "Great, thank you very much, you have a good one." Aplt. Br. at 10. Mr. Manzano asked, "we are finished?," and the officer replied affirmatively. Id. Mr. Manzano then asked the officer's name, shook his hand, and again exited the patrol car. II R. at 19.

The officer's suspicions were not mollified by Mr. Manzano's responses, however, and again before Mr. Manzano could enter his vehicle the officer reinitiated contact and asked whether there was anything in the vehicle he should know about, including weapons, drugs, or large amounts of cash. Id. at 19-20. Mr. Manzano immediately replied he did not have any of these items and gestured toward the vehicle saying, "Go ahead." Id. at 19, 43-44. The officer then specifically asked if he could search the vehicle, and Mr. Manzano replied, "No problem." Id. at 20. At the officer's suggestion, Mr. Manzano got back into the patrol car to stay warm during the search. Id.

The officer began searching the exterior front passenger area of the vehicle,

- 4 -

looking down the venting near the windshield at an area he knew was commonly used to hide contraband, and immediately he noticed a thin metal plate, Bondo,[2] and some paint that did not match the rest of the vehicle. Id. at 21-22. He also observed tampering and tool marks on the front fender, which he knew to be commonly used as an access route to the suspected compartment area. Id. at 29-30. Upon seeing this, the officer radioed for a canine unit, Id. at 24, and while waiting for it to arrive, the officer informed Mr. Manzano that he had found a compartment on the vehicle and asked whether Mr. Manzano wanted to cooperate, but Mr. Manzano replied that he did not know about the compartment or whether there was anything in it. Id. at 26. The officer then asked for permission to continue searching the car and again Mr. Manzano consented. Id.

When the drug dog arrived, it alerted to one spot on the exterior of the vehicle and three spots on the interior. Id. at 66-67. After being told of the dog's alerts, two officers removed some molding on the vehicle and punctured the modified area to access the suspected compartment. Id. at 28, 63. Inside, they found a "vacuum-sealed, brick-shaped package that was white in color." Id. at 29; see also id. at 32-33. Mr. Manzano was subsequently arrested and read his Miranda rights, and the vehicle was towed to the Wyoming Department of

_____

[2]The officer testified that Bondo is a "putty-like substance . . . use[d] to fix crashed cars, to make dents go away on crashed cars. They put it on there, let it dry . . . and sand it down real fine and paint back over it." Id. at 24.

Transportation where a total of 10.9 pounds of cocaine was recovered. Id. at 34; Aplee. Br. at 8.

In a written order after the suppression hearing, the district court held that the search was lawful based on Mr. Manzano consent to answer the officer's questions and the search of his vehicle. The court also found that aside from Mr. Manzano's consent, the officer had reasonable suspicion based on his observations of Mr. Manzano and the vehicle, which ultimately developed into probable cause once the drug dog alerted to the vehicle.

## Discussion

On appeal, Mr. Manzano does not challenge the initial traffic stop. Instead, he argues that (1) he was unlawfully detained after the traffic stop had ended, and (2) the vehicle was unlawfully searched. In reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government. United States v. Rosborough, 366 F.3d 1145, 1148 (10th Cir. 2004). Determining credibility of witnesses and assigning the weight to be given to evidence is the province of the district court, and we accept the district court's factual findings unless they are clearly erroneous. Id. We review de novo the "'ultimate determination of reasonableness under the Fourth Amendment.'" Id.

A.) <u>Unlawful detention</u>

Generally, a traffic stop may last only as long as is "necessary to effectuate the purpose of the stop." <u>United States v. Manjarrez</u>, 348 F.3d 881, 885 (10th Cir. 2003) (quoting <u>United States v. Hunnicutt</u>, 135 F.3d 1345, 1349 (10th Cir. 1998)). However, additional questioning unrelated to the purpose of the stop is permissible if (1) the officer has reasonable suspicion that the driver is involved in illegal activity, or (2) the driver voluntarily consents. <u>United States v. Taverna</u>, 348 F.3d 873, 877-78 (10th Cir. 2003). Voluntariness is a question of fact determined by considering the totality of the circumstances. <u>Manjarrez</u>, 348 F.3d at 885. Consent is given voluntarily when a reasonable person would feel free to leave or disregard the officer's request. <u>Id.</u> at 885-86. It is the government's burden to show the absence of "duress or coercion, express or implied." <u>Id.</u> at 886.

Here, Mr. Manzano was detained until the officer returned his license and documentation and told him he was free to go. However, at that point, Mr. Manzano felt free to go, as evidenced by that fact that he got out of the patrol car and walked towards his vehicle. <u>See</u> <u>Taverna</u>, 348 F.3d at 879; <u>United States v. Garcia-Rodriguez</u>, No. 04-8047, 2005 WL 752728, at *4 (10th Cir. Apr. 4, 2005). Thus, when the officer reinitiated contact and asked if he would answer some questions, Mr. Manzano voluntarily consented when he replied, "sure" "no

- 7 -

problem." Aplee. Br. at 4.  The videotape clearly shows the officer's demeanor throughout the encounter was calm and conversational.  He did not raise his voice, touch Mr. Manzano, or display his weapon.  See Rosborough, 366 F.3d at 1149 (listing factors tending to show coercion).  Indeed, when the officer indicated he was finished asking questions, Mr. Manzano asked the officer's name and shook his hand before proceeding to his vehicle, suggesting he did not feel coerced or threatened.

Mr. Manzano further argues, without citation to any authority, that even if the initial questioning was consensual, he was unlawfully detained when the officer began questioning him the third time without again getting consent.  We disagree.  Where someone voluntarily consents to questioning and does not revoke that consent while the questioning is continuing, it is not necessary for the officer to continually renew consent with each new inquiry.  Regardless, Mr. Manzano's behavior demonstrates he willingly answered these questions as well.  As stated above, he was again walking towards his vehicle to leave when the officer approached him and he answered the officer's questions without hesitation, and under these circumstances, the nature of the officer's questions is not sufficient to render the encounter non-consensual.  See Garcia-Rodriguez, 2005 WL 752728, at * 4 (holding key is whether person feels free to leave when they consent to answer officer's questions, not whether the officer would have

actually allowed the person to leave).

B.) Unlawful search

Mr. Manzano also argues that his vehicle was unlawfully searched. First, he again asserts that his consent to search was involuntary; and second, he argues that even if his consent was voluntary, the officer exceeded the scope of his consent by "dismantl[ing] the front vent, windshield wipers and air bag compartments." Aplt. Br. at 28.

A warrantless search of a vehicle is proper under the Fourth Amendment when the person in control of the vehicle gives voluntary consent to search. Taverna, 348 F.3d at 878. In establishing the voluntariness of consent to search, "the Government must: (1) proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given; and (2) prove that this consent was given without implied or express duress or coercion." Id. (internal quotations and citation omitted). The scope of consent is a question of fact based on what a reasonable person would have understood the scope to be under the circumstances. Rosborough, 366 F.3d at 1150 (citing Florida v. Jimeno, 500 U.S. 248, 251 (1991)). "A general grant of permission to search an automobile typically extends to the entire car, absent an objection or an express limitation by the grantee." Id. Indeed, the failure to object suggests the search was within permissible bounds. United States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996)

(citations omitted). However, a search can become "so invasive or destructive" as to exceed the bounds of consent even without an objection. United States v. Osage, 235 F.3d 518, 520 (10th Cir. 2000) (internal quotations and citation omitted).

As noted above, Mr. Manzano felt free to leave when he told the officer he did not have any contraband in the vehicle and gestured toward the vehicle stating, "go ahead." The officer then specifically asked if he could search the vehicle and Mr. Manzano replied, "No problem." II R. at 20. Regarding the scope of Mr. Manzano's consent, based on his response to the officer's request, it is clear he did not expressly limit where the officer could search. Further, Mr. Manzano gave his consent immediately after the officer had asked whether there were any drugs in the vehicle. Thus, a reasonable person would understand that by consenting to the officer's request he would be allowing a search of places where drugs might be found. See United States v. Marquez, 337 F.3d 1203, 1209 (10th Cir. 2003); United States v. Pena, 143 F.3d 1363, 1368 (10th Cir. 1998).

Upon receiving permission to search, the officer examined an area known to be used as a compartment to hide contraband in the exterior front passenger area of the vehicle, and looking down the venting near the windshield, he noticed a non-factory modification, including Bondo and non-matching paint. But rather than immediately dismantling the vehicle to access the suspected compartment, he

- 10 -

called for a canine unit and waited for the dog to alert. II R. at 20-24. By this point, the officer had probable cause to search for drugs and was no longer relying solely on consent. Rosborough, 366 F.3d at 1152 (holding dog alert on vehicle creates probable cause to search the vehicle for drugs); United States v. Anderson, 114 F.3d 1059, 1066 (10th Cir. 1997) (holding that suspicious circumstances coupled with evidence of hidden compartment creates probable cause to search for drugs). Thus, even assuming dismantling the area around the secret compartment went beyond the scope of consent,[3] the officer's actions were not unreasonable under the Fourth Amendment.

We hold that Mr. Manzano was not unlawfully detained as he voluntarily consented to answer the officer's questions, and the vehicle search was lawful as Mr. Manzano voluntarily gave general consent and it was ultimately supported by probable cause.[4]

---

[3]This assumption is far from clear as this court has repeatedly held that an officer can partially disassemble a vehicle based on consent when the driver fails to object. See United States v. McRae, 81 F.3d 1528, 1537-38 (10th Cir. 1996); United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994); United States v. Pena, 920 F.2d 1509, 1514-15 (10th Cir. 1990); United States v. Espinoza, 782 F.2d 888, 892-93 (10th Cir. 1986).

[4]Because we hold that Mr. Manzano voluntarily consented to the extended detention and vehicle search, we decline to address whether the officer's actions were supported by reasonable suspicion. See United States v. Sandoval, 29 F.3d 537, 542 n.6 (10th Cir. 1994) ("We are free to affirm a district court on any grounds" supported by the record.)

AFFIRMED.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge